119 N.J. Super. 457 (1971)
292 A.2d 580
NEW JERSEY SPORTS & EXPOSITION AUTHORITY, PLAINTIFF,
v.
JOSEPH M. McCRANE, JR., ETC., LOUIS MONTENEGRO ET ALS., DEFENDANTS. HENRY CHEVAL ET ALS., PLAINTIFFS,
v.
STATE OF NEW JERSEY ET ALS., DEFENDANTS. MONMOUTH PARK JOCKEY CLUB, PLAINTIFF,
v.
NEW JERSEY SPORTS & EXPOSITION AUTHORITY, DEFENDANT.
JAMES L. PLOSIA ET ALS., PLAINTIFFS,
v.
NEW JERSEY SPORTS AND EXPOSITION AUTHORITY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided November 15, 1971.
*462 Mr. George F. Kugler, Jr., Attorney General of New Jersey, (Mr. Joseph M. Clayton, Jr., Deputy Attorney General appearing), attorney for New Jersey Sports & Exposition Authority.
Mr. T. Girard Wharton special counsel appointed by the Supreme Court of New Jersey, for Joseph M. McCrane, Jr., Treasurer of the State of New Jersey.
Mr. Alfred A. Porro, Jr., attorney for Henry Cheval et als.
Messrs. Wilentz, Goldman & Spitzer (Mr. Robert N. Wilentz, appearing), attorney for Monmouth Park Jockey Club.
Mr. William D. Gorgone for James L. Plosia et als.
Messrs. Chandless, Weller & Kramer (Mr. Ralph W. Chandless, appearing), attorney for Township of South Hackensack and Board of Education of South Hackensack, intervenors.

I The Act
PASHMAN, A.J.S.C.
On January 12, 1971, in his annual address to the Legislature, Governor Cahill noted the potential of a sports complex in the meadowlands to be occupied by one or more major league sports teams.
On April 19, 1971, the Sports Complex bill was introduced and overwhelmingly passed in the Senate by a 28-2 vote and in the Assembly by a 53-6 vote.
*463 On May 10, 1971, Governor Cahill signed L. 1971, c. 137, the New Jersey Sports and Exposition Authority Law, now cited as N.J.S.A. 5:10-1 et seq. The act creates the Authority as "an instrumentality of the State exercising public and essential governmental functions."
The Legislature specifically found that "the general welfare, health and prosperity of the people of the State [will] be promoted by the holding of athletic contests, horse racing and other spectator sporting events and of trade shows and other expositions * * *; that in order to induce professional athletic teams * * * to locate these franchises in the State, it is necessary to provide stadiums and related facilities for the use of such teams, in addition to the facilities for horse racing and other spectator events; that such stadiums and other facilities would also accommodate other events and serve other uses which would provide needed recreation, forums and expositions for the public." The Legislature further found that "additional facilities [were] needed * * * to accommodate trade shows and other expositions in order to promote industry and development * * * and provide a forum for public events." The Legislature declared that the location of the complex in the meadowlands "would stimulate the needed development" of the area. N.J.S.A. 5:10-2.
The Authority is empowered
* * * to establish, develop, construct, operate, maintain, improve and otherwise effectuate a project to be located in the Hackensack meadowlands upon a site not to exceed 750 acres consisting of one or more stadiums, coliseums, arenas, pavilions, stands, field houses, playing fields, recreation centers, courts, gymnasiums, club houses, a race track for the holding of horse race meetings, and other buildings, structures, facilities, properties and appurtenances incidental and necessary to a complex suitable for the holding of athletic contests or other sporting events, or trade shows, exhibitions, spectacles, public meetings or other expositions, and such project may include driveways, roads, approaches, parking areas, parks, recreation areas, food vending facilities, restaurants, transportation structures, systems and facilities, and equipment, furnishings, and all other structures *464 and appurtenant facilities related to, necessary for, or complementary to the purposes of the project or any facility thereof. [§ 6(a)]
To carry out this statutory mandate the Authority is given the power of eminent domain (§ 9) and is authorized to issue bonds and notes which are expressly not debts of the State. § 10. The Authority may relocate public highways and utilities after consultation with the Meadowlands Commission and the Department of Transportation. In locating and constructing the sports and exposition facilities the Authority is exempt from State and local zoning, planning and building codes. § 5(x).
The Authority is a public body corporate and politic established in the Department of Community Affairs. § 4(a). Its membership consists of the State Treasurer, the Attorney General and a member of the Hackensack Meadowlands Development Commission to be appointed by the Governor, all three being members ex officio, while four other members are to be appointed by the Governor with the advice and consent of the Senate. § 4(b). From the latter group the Governor is to appoint a chairman, while the entire membership is to choose a vice-chairman as well as a secretary and treasurer (the latter two need not be members). § 4(d).
The Legislature has the power to dissolve the Authority, provided "no debts or obligations [are] outstanding or that provision has been made for the payment or retirement of such debts * * *. Upon any such dissolution of the Authority all * * * assets thereof shall be vested in the State." § 4(h).
The final provision in the act appropriates $1,500,000 from the General State Fund for the purpose of carrying out its functions and duties pursuant to the act. Said appropriation is to be repaid to "the General State Fund out of the proceeds of the first bonds issued by the Authority or other available funds." § 27.
At the organizational meeting of the Authority the membership requested that the State Treasurer transfer to the *465 Authority $100,000 from an appropriation of $1,500,000 for the purpose of defraying preliminary expenses. The Treasurer refused, expressing doubts as to the constitutionality of the enabling statute. In May 1971 the Authority instituted suit for a declaratory judgment as to the validity of the act. Special counsel to represent the Treasurer was appointed by the New Jersey Supreme Court pursuant to N.J.S.A. 2A:1-10. This sequence of facts presents a justiciable controversy ripe for judicial determination.
Subsequently, additional parties were permitted to intervene and three additional suits have been filed challenging the constitutionality of the act. All such suits presently pending have been consolidated by the court on its own motion pursuant to R. 4:38-1. Whenever reference is made to defendants or challengers it is intended to include all parties opposed to the Authority and claiming unconstitutionality of the act.
The decision of this court encompasses the disposition of the cases listed at the head of this opinion.
The Township of Hackensack and its board of education were permitted to intervene in the first-captioned suit. The National Audubon Society was permitted to join as a party-plaintiff in the second-mentioned suit by the addition of a sixth count.

II Summary Judgment
The New Jersey Sports and Exposition Authority Law (herein called the act) and the appointed individuals (herein called the Authority), Monmouth Park Jockey Club (herein called Monmouth Park) and South Hackensack Township and its board of education et al. have filed motions for summary judgment. Counsel for State Treasurer Joseph M. McCrane, T. Girard Wharton, appointed by the New Jersey Supreme Court (herein called public counsel), Messrs. Porro and Gorgone representing Cheval et al. (herein referred *466 to as Cheval) and Ploscia et al. (herein referred to as East Rutherford) respectively contend that summary judgment is precluded.
R. 4:46-2 sets forth the guidelines as to summary judgment:
The motion for summary judgment shall be served with briefs and with or without supporting affidavits. The judgment or order sought shall be rendered forthwith in accordance with R. 1:7-4 if the pleadings, depositions and admissions on file, together with the affidavits, if any, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. A summary judgment or order, interlocutory in character may be rendered on any issue in the action (including the issue of liability) although there is a genuine factual dispute as to any other issue (including any issue as to the amount of damages). Subject to the provisions of R. 4:42-2 (judgment upon multiple claims), a summary judgment final in character may be rendered in respect of any portion of the damages claimed.
The parties have stipulated the following:
1. State officials have been conducting negotiations with the New York Football Giants and other professional sports teams in an attempt to bring a professional major league sports team to New Jersey.
2. The Hackensack meadowlands constitutes a vast reservoir of vacant lands situated in the midst of the New York-Northeastern New Jersey metropolitan area, located only a few miles from Manhattan, and criss-crossed by rail transportation and various major highways, including the New Jersey Turnpike and New Jersey Routes 1-9, 3, 7, 17, 20 and 46.
3. The revenues of the new track would be required, and will actually be used, for the construction of facilities in addition to the track itself, namely for a stadium and other facilities within the project.
4. The new track will have available for its operations a percentage of its handle greater than the percentage of handle available to Monmouth Park for its operations. Additionally, it will, of course, have available the "breaks," which will be at least as large as the "breaks" turned over to the State by Monmouth Park.
5. Monmouth Park paid into the State Treasury of New Jersey for the calendar years 1966 through 1970, inclusive, over $52,000,000.
6. The Racing Commission estimate of revenues for the fiscal year 1971-1972 indicates payment by Monmouth Park of $12,000,000 into the State Treasury.
7. For the fiscal years ending 1966 through 1970, inclusive, all four tracks (Monmouth Park, Garden State, Atlantic City and Freehold) *467 paid into the Treasury of the State of New Jersey for all of their activities, whether flat or running races, approximately $162,000,000.
8. The officially estimated revenue for the fiscal year 1971-1972 from all of said tracks is $37,000,000.
9. On August 26, 1971 the Authority and the New York Football Giants, Inc. entered into a lease of a stadium to be built on a site in East Ruthorford, New Jersey. The site is the area adjacent to and bounded by Route 3, Berry's Creek, Paterson Plank Road and the western spur of the New Jersey Turnpike. Preliminary design for the site includes a 75,000-seat stadium, a race track, an exposition hall, a hotel, and parking for a minimum of 25,000 cars and 400 buses. If commitments can be obtained from other professional sports teams, a 50,000-seat baseball stadium and a 20,000-seat arena may also be constructed on the site.
10. The projected site includes substantial acreage claimed by the State to be state-owned tidelands.
11. No public notice of an intent to pass special legislation was published.
12. All four existing race tracks in New Jersey were privately financed, as are many hotels and parking facilities in the metropolitan area.
It is further stipulated that the following facts may be assumed for the purpose of argument on the Authority's motion for summary judgment. The Authority reserves the right to prove facts contrary to those assumed below in the event the court determines that such facts are legally relevant and necessary to its final decision.
1. There will be no balance remaining for deposit in the General State Fund under section 6b(6) of the act.
2. The operation of the new track will result in a net decrease in racing receipts flowing into the State Treasury. In other words, payment of 1/2 of 1% of pari-mutuel pools by the new track will be more than offset by the loss of revenue resulting from the decrease of pari-mutuel pools experienced by existing tracks as a result of competition from the new track.
3. Monmouth Park Jockey Club will suffer a decrease in profit as a result of the operation of the new track.
4. A substantial loss of tax ratables will be incurred by the Borough of East Rutherford.
5. The Borough of East Rutherford will experience an increased demand for municipal services as a result of the development of the sports complex.
*468 6. A factual issue exists with respect to the potentially deleterious impact of a major project such as the sports complex upon the environment of the meadowlands district.
In Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954), the classic statement was made and is still viable as the definite expression of the standards of decision governing the granting or denial of a motion for summary judgment. Justice Brennan said:
The standards of decision governing the grant or denial of a summary judgment emphasize that a party opposing a motion is not to be denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact. At the same time, the standards are to be applied with discriminating care so as not to defeat a summary judgment if the movant is justly entitled to one.
Thus it is the movant's burden to exclude any reasonable doubt as to the existence of any genuine issue of material fact, 6 Moore's Federal Practice, par. 56.15(3). The phrasing of our rule, R.R. 4:58-3, slightly different from Federal Rule 56(c), underscores this in the requirement that the absence of undisputed material facts must appear "palpably." All inferences of doubt are drawn against the movant in favor of the opponent of the motion. The papers supporting the motion are closely scrutinized and the opposing papers indulgently treated. Templeton v. Borough of Glen Rock, 11 N.J. Super. 1, 4 (App. Div. 1950). And it is not to be concluded that palpably no genuine issue as to any material fact exists solely because the evidence opposing the claimed fact strikes the judge as being incredible. Arnstein v. Porter, 154 F.2d 464, 469 (C.C.A. 2 1946). Issues of credibility are ordinarily for the trier of fact, and the judge does not function as a trier of fact in determining a motion for summary judgment. Where the judge questions the inherent credibility of the matter offered in opposition there are other alternatives to the rejection of the matter and the grant of the motion. Under R.R. 4:58-5 "leave to proceed may be given unconditionally, or upon such terms as to giving security, or time or mode of trial, or otherwise, as may be deemed just." [at 74-75].
The affidavit submitted by James Ploscia, mayor of East Rutherford and a plaintiff in one of the consolidated actions herein, also attempts to create issues of fact. Most of these issues have been stipulated or are not relevant to a consideration of constitutionality. The affidavit is couched in conclusions *469 of law with a sprinkling of undisputed facts. In large part it synopsizes and advances many of the legal arguments made in counsel's brief.
I am not forgetful of the consequences that accrue where a judge is hasty or premature in ruling that summary judgment will lie. I fully agree that the motion should be continued "where pretrial depositions and discovery may serve to remove doubts as to whether there are disputed questions of material facts." Templeton v. Glen Rock, 11 N.J. Super. 1, 4-5 (App. Div. 1950). However, the court must first determine whether there is a genuine issue as to a material fact. Here I am not at all persuaded that there is such an issue.
I do not believe that the matter as presented to me in the pleadings, affidavits, briefs, stipulations and oral argument can be said to rest on a paucity of information. The record is complete and is not at all similar to the situation in Jackson v. Muhlenberg Hospital, 53 N.J. 138 (1969). There the court found that "[t]he issue is a very important one involving highly significant policy considerations and obviously should not be decided on the wholly inadequate record * * *." Unlike Jackson, the ruling sought in the case at bar does not reach beyond this statute. Here, we have an adequate record on which to decide the legal issues.
While I am aware that summary judgment should be granted with caution, Devlin v. Surgent, 18 N.J. 148, 154 (1955), the caution should not result in the failure to utilize the procedure where the movant is justly entitled to one.
After oral argument on the motions for summary judgment on September 30, 1971 it developed that public counsel, Cheval and East Rutherford desired discovery and a plenary trial notwithstanding the stipulations arrived at after extended conferences between counsel and the court. In view of the extensive factual stipulations, I saw no benefit or necessity in taking testimony. Wherever a genuine factual dispute could arise, the parties have stipulated for the purposes *470 of these motions. Further details of the factual dispute would contribute nothing to the determination of the question of constitutionality.
Cheval had served a notice to produce certain documents. These were supplied to all parties. Additional information as to bonding and soil borings was requested but was not available at this time. Further, it is inconceivable that the financial information sought would be available until some time after the determination of constitutionality and the retention of a financial management group. In any case, the information would have no materiality to the outcome of this case.
Cheval also served a notice to depose New Jersey Treasurer Joseph M. McCrane, chairman of the Authority, Mr. David Werblin and Commissioner of Environmental Protection, Richard J. Sullivan. An attempt during the oral argument to ascertain what facts were sought of these individuals at the deposition was unrevealing. No specific answer was forthcoming. It was pointed out that such officials would be generally immune from deposition if the purpose was to ascertain their mental processes. New Jersey Turnpike v. Sisselman, 106 N.J. Super. 358, 367 (App. Div. 1969), aff'd 54 N.J. 565 (1969). Much, if not all, of that which could be obtained from them was given voluntarily by documents and stipulation. The New York Giants lease, although given to defendants, is not part of this case, which was filed some months before the lease was signed. This instrument has no relevancy and must, of course, be subject to the final determination of the issues presented.
If Commissioner Sullivan was to be an expert for defendants, no such arrangement was made known to the court. His deposition would revolve about the environmental issue. That issue has been stipulated to exist, but, as will be demonstrated, it is not material at this stage. Nevertheless, Cheval and others have submitted affidavits to the general effect that the complex will have a deleterious impact on the meadowlands district. The credentials of the affiants are impressive. *471 There is no need to capsulize each separately. The question is whether this factual issue affects the constitutionality of the act. If it does, testimony would be necessary under the stipulation. If the determination of this factual issue  alleged ecological imbalance  does not affect the constitutionality of the act, there is no need at this time to consume days and weeks in the taking of this testimony. Similar reasoning applies to other issues.
It must be remembered that the stipulation encompasses many, if not all of the material facts challenged. Mr. Wilentz, counsel for Monmouth Park, filed a motion for summary judgment; he does not request discovery or a plenary trial. The two affidavits which he filed do not change the relative positions on summary judgment motions.
All agree that the so-called gambling issues are ripe for summary judgment. Cheval and East Rutherford also concede that the following arguments may be determined in a summary judgment motion: (1) separation of powers; (2) public trust of tidelands, and (3) conflict of interest.
The remaining factual issues, they contend, require a plenary trial. Similarly, public counsel urges a trial on the ecology issue.
In Meadowlands Regional Development Agency v. State, 112 N.J. Super. 89, 95, 96 (Ch. Div. 1970), Judge Trautwein observed that the Appellate Division found that defendants' admissions obviated the need for taking proofs prior to oral argument on cross-motions as to whether the legislation was a special law. So have the stipulations in this case obviated the need for further proof at a plenary trial. Ultimately there were some proofs taken in Meadowlands not reported in the decision. I will refer further to the Meadowlands decision under the portion of this opinion dealing with special or local laws.
To repeat, there is no argument with the position of Cheval, East Rutherford and Public Counsel that contested issues of fact should not be resolved on a motion for summary judgment. Sautto v. Edenboro Apartments, Inc., 69 *472 N.J. Super. 420, 430 (App. Div. 1961). But this legal theory presupposes two facts, that (1) the challenged issues of fact are material to the determination as to constitutionality, and (2) there is a genuine issue as to that fact.
The rule is designed to provide a prompt and business-like disposition of any cause in which an evaluation of the merits in the pleadings, affidavits and stipulations clearly shows an absence of any genuine issue of a material fact requiring disposition at a trial. If such a conclusion is reached after considering this, there is no necessity for a plenary trial.

III Public Purpose
Defendants contend that the act is in violation of N.J. Const. (1947), Art. VIII, § III, par. 3, which provides:
No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatsoever.
The prohibitions embodied in that paragraph are aimed at assuring that public money be raised and used only for public purposes. Roe v. Kervick, 42 N.J. 191, 207 (1964). The question, therefore, is whether the provisions of the act under consideration satisfy the constitutional requirement of fostering a valid public purpose.
Initially it should be noted that several general propositions provide guidance in the area of construing statutes in the light of constitutional mandates. Thus, there is a presumption in favor of the validity of the statute. McDonald v. Board of Election Com'rs of Chicago, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); United States v. National Dairy Products Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963); Stothers v. Martini, 6 N.J. 560, 567 (1951). Unless its repugnancy *473 to the State Constitution is so manifest that it leaves no room for reasonable doubt, the act should be held constitutional. Behnke v. New Jersey Highway Authority, 13 N.J. 14, 25 (1953). Further, an act of the Legislature should not be declared void for unconstitutionality when construction can be given to the act which will not have that effect. While a forced or unnatural construction is to be avoided, the court has a duty to construe the statute as to render it constitutional if it is reasonably susceptible to such a construction. Woodhouse v. Woodhouse, 17 N.J. 409, 416 (1955); Scales v. United States, 367 U.S. 203, 211, 81 S.Ct. 1469, 1477, 6 L.Ed.2d 782 (1961).
The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).
In the situation at hand, none of the litigants disputes the purpose of government in the connotation of the act. An elementary object of that government is to further the health, safety and general welfare of the people. This end result is the target.
The determination of what constitutes a public purpose is primarily a function of the Legislature and should not be overruled by the courts except in instances where that determination is clearly arbitrary, capricious or unreasonable. Roe v. Kervick, supra, 42 N.J. at 229; Bazell v. Cincinnati, 13 Ohio St.2d 63, 233 N.E.2d 864 (Sup. Ct. 1968).
As Justice Francis said in upholding the constitutionality of the Area Redevelopment Assistance Act in Roe v. Kervick, supra:
The cases referred to are not identical with our issue but they are sufficiently analogous and persuasive to demonstrate the modern tendency of legislatures to meet challenges presented by pressing socio-economic *474 needs of our times. They re-emphasize also the long-established principle of judicial deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution. And they project into the foreground of judicial study of attacks thereon, the equally-settled doctrine that the means are presumptively valid, and that reasonably conflicting doubts should be resolved in favor of validity.
In considering whether the statutory scheme represents performance of such a public purpose as will not offend the Constitution, we, too, are not unmindful of the role of the legislative branch of government. It must be assumed that the legislators are aware of the restrictions on use or loan of public money, and of the requirement that it be employed only for public purposes within the meaning of the Constitution. Consequently, when the Legislature promulgated the scheme described in the Area Redevelopment Assistance Act and declared it to represent a means of accomplishing a valid public purpose, the decision is entitled to great weight in the courts. It should not be set aside as violative of the organic charter unless there is no reasonable basis for sustaining it. If there can be reasonable difference of opinion as to validity of a plan devised to effectuate a public purpose, the judiciary should defer to the legislative judgment. This is particularly true when the issue involves a concept which varies with the needs of the times and so is incapable of precise definition. [42 N.J. at 229-230; emphasis added].
And in support of the deference accorded such legislative determinations, Justice Francis went on to quote the United States Supreme Court in Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245 (1936), as follows:
"The existence of local conditions which, because of their nature and extent, are of concern to the public as a whole, the modes of advancing the public interest by correcting them or avoiding their consequences, are peculiarly within the knowledge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods * * *. As with expenditures for the general welfare of the United States * * * whether the present expenditure serves a public purpose is a practical question addressed to the lawmaking department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court." 301 U.S. at pp. 514-515, 57 S.Ct. at p. 875, 81 L.Ed. 1245 [at 230 emphasis added]
The broad scope of legislative discretion to determine what constitutes a public purpose and how it may be accomplished *475 was again succinctly expressed by Justice Douglas speaking for the United States Supreme Court in Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954):
The concept of the public welfare is broad and inclusive. * * * The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. * * * Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. * * * [T]he means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. [348 U.S. at 33, 75 S.Ct. at 102, 99 L.Ed. at 98; emphasis added]
Hence, the court should not second-guess the Legislature when "reasonable men might differ as to whether the means devised to meet the public need conform to the Constitution." Roe v. Kervick, supra, 42 N.J. at 229, New Jersey Mortgage Finance Agency v. McCrane, 56 N.J. 414, 422 (1970). Moreover, the mere fact that some private benefit accrues as a result of the legislation does not invalidate the act. Roe v. Kervick, supra, 42 N.J. at 218, 233 and cases cited therein.
In McCutcheon v. State Building Authority, 13 N.J. 46 (1953), Justice Jacobs, in his dissenting opinion, joined by Justice Brennan, quoted Justice Holmes:
"Great constitutional provisions must be administered with caution. Some play must be allowed for the joints of the machine, and it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts. Missouri, Kansas & Texas Railway Company of Texas v. May, 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971, 973 (1904) [at 79]
Finally, in Behnke v. New Jersey Highway Authority, supra, Justice Heher, speaking of social and economic needs arising from the complexities of modern life observed:
*476 While constitutional limitations are in their very nature inflexible in meaning and immune to varying public opinion, social and economic needs arising from the complexities of modern life call for new applications of the principle; and the Constitution would not serve its essential purpose were it insensitive to the demands of a changing society and economy. Home Building and Loan Association v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934); Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The principle itself is unalterable except by the will of the people expressed in the constitutional mode, but accommodation to new needs without a violation of the essence of the principle does not contravene the intent of the instrument. We are concerned with the spirit of the limitation, and in that inquiry related provisions must be held in view. The true rule of construction "is not to consider one provision of the Constitution alone, but to contemplate all, and therefore to limit one conceded attribute by those qualifications which naturally result from the other powers granted by that instrument, so that the whole may be interpreted by the spirit which vivifies, and not by the letter which killeth." Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 796, 45 L.Ed. 1088, 1116 (1901), White, J. [13 N.J. at 25-26]
And it is no answer to say that this public need was not constitutionally envisioned 50 years ago. That Constitution, with which the law measures "public purposes," was created to endure for ages and was intended therefore to be adopted for the many crises of human affairs generated by changing social needs and the demands for sensitivity towards them.
To repeat, the determination of what constitutes a valid public purpose and the selection of the means to achieve that purpose are matters peculiarly within the judgment of the Legislature. The legislative decision  by a substantial majority  that the purpose to be served by a particular enactment is a valid public purpose is a conclusion entitled to great weight by the courts. It should not be set aside unless there is no reasonable basis for sustaining it.
The cardinal principle of statutory construction must be to save and not to destroy. The duty of the court is to strain if necessary to save the act, not to nullify it.
It must be remembered that the greatest danger to people from the exercise of the judicial power is that there may be *477 a usurpation by the courts of the people's right to express in law, by overwhelming numbers of their elected legislators, their collective reasoning. Rights are fragile. A personal determination cannot be substituted for the law because it accords with a judge's own feelings or pleases a special interest group at the moment. Our obligation is to dispassionately apply the people's will, as expressed through the democratic process consisting of the legislative vote. That law when enacted must be constitutional.
In the act in question the Legislature has expressly declared that the Sports Authority is "an instrumentality of the State exercising public and essential governmental functions," N.J.S.A. 5:10-4, and that the authority and powers conferred in the act and the expenditures of moneys pursuant thereto "constitute[s] a serving of a valid public purpose." Id., § 2. Specifically, in section 2 the Legislature has determined that the Sports Authority will promote the public health, welfare and prosperity of the people of the State by providing needed facilities for recreational purposes, by accommodating trade shows and other expositions designed to promote industry and development within the State, and by creating a forum for other public events. Further, the Legislature has found that the Sports Authority will serve the public interest by stimulating much-needed development of the Hackensack meadowlands, long an area of public interest and concern. See N.J.S.A. 13:17-1 et seq.; Meadowlands Regional Development Agency v. State, supra, 112 N.J. Super. 89 (Ch. 1970).
An evaluation of these legislative findings vis-a-vis the "public purpose" requirements of Article VIII of our 1947 State Constitution necessarily involves an understanding of that concept in and of itself.
In Barnes v. City of New Haven, 140 Conn. 8, 98 A.2d 523, (1953), quoted in Katz v. Brandon, 156 Conn. 521 at 532, 245 A.2d 579 at 586 (1968), the Connecticut Supreme Court of Errors observed:
*478 A public use defies absolute definition, for it changes with varying conditions of society, new appliances in the sciences, changing conceptions of the scope and functions of government, and other differing circumstances brought about by an increase in population and new modes of communication and transportation. * * * Courts as a rule, instead of attempting judically to define a public as distinguished from a private purpose, have left each case to be determined on its own peculiar circumstances. Promotion of the public safety and general welfare constitutes a recognized public purpose. "If the expenditure of public funds will promote the welfare of the community, it is for a public purpose." The modern trend of authority is to expand and liberally construe the meaning of "public purpose." The test of public use is not how the use is furnished but rather the right of the public to receive and enjoy its benefit. [140 Conn. at 15, 98 A.2d at 527; emphasis added].
The New Jersey Supreme Court, in Roe v. Kervick, supra, observed that
The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare. [42 N.J. at 207; emphasis added]
More recently, in New Jersey Mortgage Finance Agency v. McCrane, 56 N.J. 414 (1970, our Supreme Court, through Justice Proctor, cited Roe and stated:
The concept of "public purpose" is broad and is merely a reflection of the changing needs of society. As the needs change, the area of permissible governmental activity must change to meet those needs. For it is elementary that the very purpose of government is to provide for the health, safety and general welfare of the people. [at 420; citations omitted].
In truth, therefore, it should be stated that a definition which will encompass all aspects of the concept is an impossibility. It is for this reason, among others, that the judiciary approaches the subject essentially on an ad hoc *479 basis, ever mindful that the concept is one peculiarly within the legislative domain. This legislative expertise will be interfered with only when no other alternative is present.
Focusing on the enactment under review, the sports and exposition complex authorized by the act will provide a multiplicity of new cultural, recreational and economic benefits to the people of the State. The Authority may construct facilities to house trade shows in order to promote industry and development in the State and to provide a forum for public events. Although it cannot be stated officially until the constitutionality of the act is determined, papers filed and public statements made in the press by Chairman Werblin of the Authority indicate that the complex, in addition to racing, will consist of flowing stocked pools for fishing, an aquarium, enclosed all-weather tennis courts, landscaping of grounds to preserve the ecology, and professional high school and college football and baseball stadiums allowing for soccer and lacrosse.
Some courts have encountered situations wherein similar enactments have been challenged on the ground that they did not serve a public purpose. In Meyer v. City of Cleveland, 35 Ohio App. 20, 171 N.E. 606 (App. Ct. 1930), a Cleveland taxpayer failed in an attempt to enjoin the construction of a stadium on the ground that it would not serve a lawful municipal purpose. In reaching its decision the court commented upon the fact that the other 48 states had 93 municipal stadiums, none of which had apparently succumbed to a legal challenge of the type mounted there. The court analogized a stadium and its functions to a public auditorium which served a public purpose, the only difference being the former was conducive to outdoor gatherings while the latter was geared for indoor performances. (Even this distinction is now partially obliterated in view of structures such as the "Houston Astrodome".) Finally, in answer to plaintiff's argument the Ohio court undertook a historical survey of stadiums and noted the following:
*480 Stadiums were constructed in Greece 600 years before the Christian era. Rome in the zenith of her power not only constructed the Coliseum at Rome, but caused similar structures to be erected and maintained in various large cities of the empire for the entertainment and edification of the public. [35 Ohio App. at 25, 171 N.E. at 607]
(Parenthetically, I might add that those conversant with such matters know that the Cleveland Municipal Stadium on the shore front of Lake Erie houses the Cleveland Indians Baseball Team as well as the Cleveland Browns Football Club.
The proposed complex clearly is not conceptually novel. As Meyer notes, similar undertakings had their existence over 2000 years ago. Meyer itself, four decades ago, recognized that the scope of what is encompassed by the terms public welfare or enjoyment is an ever-widening one. 35 Ohio App. at 24, 171 N.E. at 607, citing Egan v. City and County of San Francisco, 165 Cal. 576, 133 P. 294 (Sup. Ct. 1913). Meyer did not directly deal with the question of whether the public purpose would be eroded in any manner when a professional baseball or football team leased the stadium. However, the court, by way of dictum, answered the question in the negative. 35 Ohio App. at 27, 171 N.E. at 608.
The issue was posed to the Maryland Court of Appeals in Green v. Garrett, 192 Md. 52, 63 A.2d 326 (1949), where Baltimore taxpayers unsuccessfully sought to enjoin the Baltimore Baseball & Exposition Company (the "Baltimore Orioles") and the Department of Recreation and Parks of Baltimore City from entering into a lease for the use of Baltimore Stadium. This stadium had previously been the scene of many athletic events, including college and professional football. Thus it could not be said that the public purpose consisted solely of actual physical usage of the facilities by Baltimore residents. The court said:
Recreation is a broad term, and it would be an unnatural use of it to say that it does not apply to watching a football or baseball game, but only applied to engaging in one. From the onlooker's point of view, a game conducted by professionals is often more interesting than one played by amateurs. The very purpose of a stadium is to afford *481 facilities for spectators. The players need only the ground to play upon. * * * Watching games of baseball, and particularly a game of professional baseball, is to many people in this country the greatest possible recreation with respect to athletic activity. We think the Department has ample power to recognize this, to provide such recreation, and to enter into a long term lease if it and the Board of Estimates think it advisable, and for the interest of the City and of its people to do so. [192 Md. at 61-62, 63 A.2d at 330; emphasis added]
These excerpts are from decisions handed down some decades ago. If anything, they greatly understate the role of spectator sports in our society today. Witness the expansion that has occurred over the past decade in all major sports, including professional football, basketball, hockey and baseball. The athletic contests themselves, including the pre-season games, are made available by the mass media during prime time. The athlete, partially in recognition of this tremendous public and commercial appeal, commands a salary commensurate with that received by the head of a large corporate structure.
The fierce competition among cities when a franchise is up for bids is further testimony to the economic benefits accruing. The lure of a new stadium, spacious parking facilities and accessible roads are extremely important factors in the competition. It is no secret that these were perhaps the primary factors behind the recent action taken by the New York Giants. And even more recently those considerations undoubtedly prompted the National Hockey League to grant, on November 10, 1971, a second franchise in the New York area (Long Island) and one in Atlanta.
This competition is further evidenced by the fact that rarely is a populous state devoid of some form of professional athletics. New Jersey is perhaps the most glaring exception in this regard. It is the only state of the ten most populated states not to have at least one major league baseball or football team of its own. In fact, all but Florida, the ninth largest state, have at least two such franchises.
The action taken by those cities which boast of major league teams to construct new stadiums or refurbish the *482 existing structures is yet another manifestation of this competition. Such action has spawned further litigation leading to more recent decisions.
In Martin v. Philadelphia, 420 Pa. 14, 215 A.2d 894 (1966), the Pennsylvania Supreme Court upheld an ordinance authorizing a loan to build a sports stadium. The court adopted the decision of the lower court in holding that a public purpose was achieved:
"A sports stadium is for the recreation of the public and is hence for a public purpose; for public projects are not confined to providing only the bare bones of municipal life, such as police protection, streets, sewers, light, and water; they may provide gardens, parks, monuments, fountains, libraries, museums, and `Generally speaking, anything calculated to promote the education, the recreation or the pleasure of the public. * * *'" [420 Pa. at 17, 215 A.2d at 896; emphasis added]
The Supreme Court of Colorado, citing Martin, reached an identical result in Ginsberg v. Denver, 164 Colo. 572, 436 P.2d 685 (1968), where plaintiff challenged the propriety of Denver's purchase of a stadium which today is the home of the "Denver Broncos," a professional football club. In the course of its decision, the Colorado court stated that the term "public purpose" was an ever broadening one. In this regard, the court commenting upon the judicial role:
It is a matter of common knowledge that most large cities in this country have constructed or planned for the construction of large sports stadiums. This court should not nullify the action of the City, which appears to be in tune with the trend of the times, if by reasonable interpretation of pertinent rules of law the action can be sustained. [164 Colo. at 580-581, 436 P. 2d at 689; emphasis added].
The same day Ginsberg was handed down, the Supreme Court of Ohio upheld the validity of the proposed construction of a stadium by a cooperative agreement between Hamilton County and Cincinnati in Bazell v. City of Cincinnati, 13 Ohio St.2d 63, 233 N.E.2d 864 (1968). Moreover, it was held that the city might operate stadium parking facilities and sell advertising space on the scoreboard and derive revenue from both.
*483 In opposition to the economic, civic and social advantages flowing from this type of sports complex, what legal authorities have been offered and urged? In opposition to the need for open-air athletics (spectator sports), which have been legally compared to and placed in the same category as the need for public parks, what cases have been cited? If, as affirmed by various authorities throughout the country, spectator sports and public parks provide necessary sources of entertainment and public relaxation, what has been argued by defendants in opposition?
The challengers cite several cases which they submit support the assertion that the act does not serve a public purpose. In Hill v. Summit, 64 N.J. Super. 522 (Law Div. 1960), a municipality's conveyance of property to an American Legion post was contested. The court held that a question of fact existed as to whether the property was to be used for a patriotic (public) purpose. If it was so used, there would be no donation or appropriation in contravention of N.J. Const. (1947), Art. VIII, § II, par. 3. Hill is inapposite, since it does not rebut the "public purpose" character of the complex.
In Albright v. Sussex County Lake & Park Com., 71 N.J.L. 303 (E. & A. 1904), the Legislature enacted a statute authorizing a county commission to acquire the right of fishing in certain lakes throughout the State, including plaintiff's. The Court of Errors and Appeals held that this was not a public use within the confines of the eminent domain power since it would provide recreation to a very narrow group. East Rutherford submits, a fortiori, that the group the complex would service is narrower, for it would be composed of those who have paid an admission fee. This attempted analogy fails. The complex, at the very least, will provide recreational opportunities to legions of racing, football and probably baseball, soccer, and hockey aficionados. Moreover, it is virtually certain that the project will attract thousands upon thousands of others with its various other *484 facilities. There is no comparison between the lure of the complex and the attraction to the public of fishing rights in those fresh water lakes.
East Rutherford's reliance on Strock v. East Orange, 77 N.J.L. 382 (Sup. Ct. 1909), is likewise misplaced. In that case playground commissioners were permitted by statute to grant permits to groups for the purpose of conducting athletic contests, exhibitions or concerts in playgrounds of five or more acres. The court struck down the statute on two grounds, the first of which charged that the five-acre classification was illusory. Secondly, the court held that the statute would allow a city to give money or property to a private individual, association or corporation, since it would be possible for a permit to be granted and an admission to be charged for the exclusive benefit of the private recipient, with no revenue accruing to the city. In essence, the statute was struck down on the basis of what its provisions might allow and not so much on what was actually done in the circumstances challenged. Defendants submit that the instant case is similar since no revenue will find its way into the General State Fund. This premise is not correct. The conclusion that private corporations are indirectly benefited is faulty. First, the Fund will receive 1/2 of 1% annually of all pari-mutuel pools. Further, it is obvious that no private corporation will use any facility without the payment of an appropriate rental. N.J.S.A. 5:10-5(h), (k). In any event, it does not necessarily follow that because there exists a possibility that no revenue will funnel into the General Fund, private corporations will be subsidized.
There is a misconception as to what benefits flow to the people of New Jersey as a result of this act. To state, as East Rutherford does, that the consideration is palpably drifting because the General Fund may derive no revenue and will in fact show a decrease in racing receipts as a result of the new track, is to miss the mark. This is similar to the argument made concerning the indirect benefits to private corporations. The answer is the same. The people will benefit *485 from the opportunities offered by the complex which will be financed by racing and other sports revenues.
East Rutherford cites City of Los Angeles v. Superior Court, 51 Cal.2d 423, 333 P.2d 745 (Sup. Ct. 1959) for the proposition that absent free recreational facilities and the return of property to the tax rolls, no public purpose is served. That case concerned the contractual arrangement entered into by the City of Los Angeles and the Brooklyn National League Baseball Club, Inc. ("Dodgers") for the construction of a stadium to house the soon-to-be "Los Angeles Dodgers." The contract was a rather detailed one and provided in essence that the "Dodgers" would construct the stadium on land conveyed to it by the city. One of the provisions also required the "Dodgers" to construct and maintain recreational facilities near the stadium. The court relied heavily on this provision in its finding that the contract served a public purpose. However, the court specifically declined to consider whether the totality of indirect benefits would also amount to the serving of a public purpose, i.e., the arrival of a major league baseball club, the club's construction of the stadium and the return of the property to the tax rolls. Hence, the case does not support the proposition urged by East Rutherford. Id., 51 Cal.2d at 431, 333 P.2d at 751.
The last legal authority I will consider is the decision which upheld the financing of the stadium which houses the Pittsburgh Athletic Co., Inc. ("Pittsburgh Pirates") and the Pittsburgh Steelers Football Club, Inc.  Conrad v. Pittsburgh, 421 Pa. 492, 218 A.2d 906 (Sup. Ct. 1966). Pursuant to statute, the city organized a Stadium Authority which would sell bonds to construct a public stadium. The city agreed to appropriate certain amounts from current revenues to the Authority if the latter sustained an operating deficit. Furthermore, if the city and Authority defaulted, the bondholders could look only to the operation and maintenance of the facility, for they were powerless to dispose of any assets of the project. Given this arrangement, *486 the majority found no violation of the debt clause of the Pennsylvania Constitution. The brief opinion by Bell, C.J., cited by defendants, voices a reluctant and grudging concurrence based upon the Pennsylvania precedent construing the debt clause of its Constitution. The Chief Justice's words concerning violation of the Constitution pertained to his disagreement with the cases cited by the majority, notwithstanding that he felt constrained to follow them. His remarks in no way imply a disavowal of the public purpose function of stadium facilities.
The public purpose was discussed in the eloquent concurring opinion by the late Justice Musmanno. I heartily subscribe to his cogent reasoning, which is in step with the times without doing violence to the provisions of a constitution. I believe his language, which follows, lays to rest the argument of the purist that it is not a governmental function to engage in the cultivation of activities such as is contemplated by the act under attack:
In this litigation we are not dealing with the horse and buggy age, but with the atomic age. But, more than that, we are dealing with a modern development in an age which properly regards as essentials for all the people services which heretofore were enjoyed only by the wealthy and the affluent. There is need today to provide the public with facilities for recreation, sports and enjoyment of outdoor athletic competition. Even passive participation as an onlooker in competitive sports stimulates a desire for physical exercise. In any event it takes the spectator into the open air and provides him with exuberant escape from the cares of the day and arms him with recharged energy to meet responsibilities as a citizen. All this helps to build up a healthy community.
It is argued by the Civic Club of Allegheny County, amicus curiae, that the construction of the Pittsburgh Stadium is not a proper use of municipal authority because, it says, it provides for "luxury service rather than an essential service." Therefore, the construction should not be allowed under the conditions set out in the various obligations. It says that "the community can survive without a baseball and football stadium, but it must have police, fire, school, sewage disposal, and other basic services."
The objective of a community is not merely to survive, but to progress, to go forward into an ever-increasing enjoyment of the *487 blessings conferred by the rich resources of this nation under the benefaction of the Supreme Being for the benefit of all the people of that community.
If a well governed city were to confine its governmental functions merely to the task of assuring survival, if it were to do nothing but provide "basic services" for an animal survival, it would be a city without parks, swimming pools, zoo, baseball diamonds, football gridirons and playgrounds for children. Such a city would be a dreary city indeed. As man cannot live by bread alone, a city cannot endure on cement, asphalt and sewer pipes alone. A city must have a municipal spirit beyond its physical properties, it must be alive with an esprit de corps, its personality must be such that visitors  both business and tourists  are attracted to the city, pleased by it and wish to return to it. That personality must be one to which the population contributes by mass participation in activities identified with that city. [421 Pa. at 507-508, 218 A.2d at 913-914]
In the face of the case law, counsel have cited nothing which in any way disputes the proposition that the complex will serve a public purpose. While it is true that the Authority is an instrumentality of the State and not of a municipality, as in most of the cases discussed, this is no basis for distinction. The case for the Authority is stronger, for example, than the case where taxpayers of a municipality must back the particular bond issue. Here, on its own, the Authority's bond issue must pay for the complex or there will be none. Neither the State nor any municipality or taxpayer stands behind it.
The significant attractions of the proposed complex will be diversified major league (and probably college) sports and horse racing. In bringing major league sports competition to New Jersey, the Authority will be providing the people of the State with rich new recreational opportunities available in almost every other large urban center in the nation, but previously unavailable in New Jersey. As incidental benefits, major league sports will bring into the State new commerce and new visitors. As respects horse racing, the Authority will bring to the northern part of the State a popular recreational opportunity previously available only in New York and the southern part of the State. Here again, the public will benefit, not just from the new recreational *488 opportunity, but also from new commerce, new employment and new visitors brought into the State as a result of the sports complex.
This multiplicity of new cultural, economic and recreational benefits that will become available to the people of the State through the activities of the Authority leads directly to the conclusion that the Authority is constituted for a public purpose.
In summary, the view that the construction and maintenance of stadiums and related facilities constitutes a public purpose has received virtually universal approval in most jurisdictions. Annotation, 173 A.L.R. 415 (1948). See also Jackson v. City of Madison, 12 Wis.2d 359, 107 N.W.2d 164, 166-167 Sup. Ct. (1961); Boston v. Merchants Nat'l Bank, 338 Mass. 245, 154 N.E.2d 702, 705 (1958); City of Greensboro v. Smith, 241 N.C. 363, 85 S.E.2d 292, 295 (Sup. Ct. 1955); Tillman v. Mayor, etc. Athens, 206 Ga. 289, 56 S.E.2d 624, 627 (Sup. Ct. 1949).
Health, recreation and sports are encompassed in and intimately related to the general welfare of a well-balanced state. Moreover, the activities of the Authority meet the criteria that have been articulated for determining whether a particular function is a proper governmental one. Among the factors denoting a governmental function is the recognition that an activity or service has been historically engaged in by local government; that it is widely so furnished today; that it would not be performed as well by a private corporation, and that it is or cannot be undertaken for private profit. Fahey v. Jersey City, 52 N.J. 103, 108 (1968). In this State the operation of "public parks, open spaces, playgrounds and places for resort rest and recreation" has been held to be a governmental function. Id., at 109. Such facilities have anciently been provided by government. Coleman v. Edison Tp., 95 N.J. Super. 600, 604 (App. Div. 1967). Today stadiums and other professional sports facilities *489 throughout the country are constructed and maintained by governmental agencies. See 10 McQuillin, Municipal Corporations, § 28.14. In large measure, governmental involvement in this area has arisen because the necessary facilities are extensive and costly. Private sources do not and probably cannot fulfill the public need and desire for such recreational facilities. Public financing is necessary, and the wide variety of recreational and other benefits flowing to that public render the function of the Sports Authority a proper governmental one. One of the tests of public use must surely be not so much how the use is furnished but rather the right of people to receive and enjoy its benefit.
Once the conclusion has been reached that the construction and maintenance of a sports and exposition complex is a valid public purpose and a proper governmental function, the Legislature is free to choose the means by which to carry out the purpose, provided, of course, that the means chosen do not run afoul of any specific constitutional prohibition. See Berman v. Parker, supra, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 Roe v. Kervick, supra, 42 N.J. at 217. It is well settled in this State that the Legislature may create a public corporation such as the Sports Authority as an instrumentality of the State to carry out public projects. See New Jersey Tpk. Authority v. Parsons, 3 N.J. 235, 243 (1949); McCutcheon v. State Bldg. Authority, 13 N.J. 46, 57 (1953). Indeed, Roe v. Kervick, supra, expressly held that the State could utilize private corporations to carry out a valid public purpose.
There is no easy formula for determining whether a given activity encompasses a "public purpose." But it should be clear that the proper function of government is to be responsive to the need for an extension of governmental activities as times change and as social problems become more complex.
Counsel have laid great stress upon professional football as the only recreational activity to be undertaken by the *490 Authority. But this is not the fact. The act specifically provides to the contrary.
It it clear that the facilities envision all types of athletic contests (professional, high school and collegiate), horse racing and other spectator sporting events, as well as trade shows and expositions. "Other events" are to be accommodated, together with "other uses" to be served which would provide needed recreation, forums and expositions. The facility would provide a forum for a host of "public events."
The "public purpose" emerges clearly when one considers the scope of this undertaking. A complex or "home" is necessary if people of character and courage are again to prove the profound moral force of sports. This is a further build-up of our social capital and a further accumulation of resources for social overhead. This capital and overhead include recreation as well as roads, housing sewers and hospitals.
This "public purpose" will and must help to build personal character and state and community pride. All those who share a true love for sports  and they are counted in the tens of millions  understand that profound moral force. It has been observed that it is not an accident that the Soviets are totally involved in the Olympics, as well as Cuba in the Pan American games. They, too, necessarily subscribe to the patent fact that sports are vital in building spirit and national pride.
On October 28, 1971 the American phenomenon and chess genius, Bobby Fischer, defeated Tigran Petrosian (a Soviet chess grandmaster) to win the right to play Boris Spassky, the world champion. Again, a Russian involvement in sports. And it is not an accident that Premier Aleksei Kosygin of the Soviet Union scored his first popular success in Canada on October 23, 1971 by attending the professional hockey game between the "Vancouver Canucks" and the "Montreal Canadians" (last year's champions). He was greeted with a standing ovation from the sell-out audience of 16,000 fans. It was reported in newspapers *491 that it was the kind of applause and cheering that hockey fans normally reserve for stars such as Bobby Hull or Bobby Orr. Hockey and all other professional sports are universal in character. They add to a mass culture. Sport is truly an international language; through it we read the minds and hearts of the fellow members of our community, state and nation  yes, even the world community.
And how extensive is the involvement of our people in all sports? This, too, is an important factor in determining whether the complex represents a project of "public interest." Recreational equipment is being purchased in excess of 400 billion dollars annually. This is not a nation of sedentary sports spectators. Annual attendance at all professional (including horse and auto racing) and college sporting events is 256 million persons. Each year major league baseball admits in excess of four million young boys and girls to its games, free of charge. Active participation in the 18 most popular sports aggregates 470 million annually  that is a 2.28 participation rate for every man, woman and child in the United States.
This indicates that we do not stop with the team members themselves. From the four-year-old slum child to the 80-year-old pensioner  no longer the sole enjoyment of the wealthy and affluent  everyone has been taken up in the excitement and passion of a thrilling play at home, a brilliant runback or a perfectly executed jump shot. We are on that field with the team. We laugh when their play sparkles and cry when they make fools of themselves. No matter what one thinks of Namath and the "New York Jets," how many of us failed to experience a twinge of his anger and frustation when a pre-season injury sidelined him for the year? For just as direct participation on the field binds one player to another in ties of loyalty and respect, so the rooter feels the same toward his fellow fan.
No matter how far they are from home, two Met fans or two Giant fans share a common experience when they meet. Each has felt the same joys, shed the same tears  for the *492 same reasons at the same times. They feel for each other and for all the thousands of other fans backing those same teams. And one should not think that sports has only a parochial interest within America. The Olympics have done more than any treaty, more than any visit by an ambassador to promote international respect and understanding.
If it were not for ping pong ("table tennis", if one does not want to insult the participants, but ping pong is somehow more dramatic), perhaps we would today have no hope for a rapprochement with Red China.
Sports are absolutely essential to the public welfare. More than this, a continual widening of spectator and direct participation sports will contribute greatly to future peace, not only of this country, but of the world.
The vital public import of sport can be seen in its existence as an ideal community. Plato believed that the truly just state was one in which each individual performed his own life's task and performed it well. For him each human being had a natural potential, and unless this was developed and perfected, the person would be unhappy and the state unjust. Plato realized that his conception of a state was ideal, for no earthly state apportions jobs solely on the basis of ability and competence. But his concept lives on as a pattern on which we can constantly remake existing societies. Nowhere on this earth is the ideal Platonic state so beautifully realized as on the playing field. Here, and only here, are tasks apportioned, not on the basis of color, or political stamp or parentage, but on the basis of competence and superior ability.
The sporting team is the microcosm of the nation  not just any nation, but an ideal nation  a nation fairer and more just than we have today. Not only are men of different races united, but they are joined in a common goal  a goal that fosters bonds of love and affection among the members of their sporting community. And the goal is a living thing. Far from demanding the sacrifice of our humanity, *493 the goal (of winning) brings out the best within the competitors, enabling them to discover themselves by reaching an ever-higher level of achievement.
Perhaps best of all, the goal of the sporting team is achieved without the necessity of killing or severely injuring another human being. This is made possible only by the rules governing the game  rules respected by both sides. If the world community had such respect for law, the threat of war would be ended forever. If the individuals in American cities had such respect, the threat of violence would be forever banished from our streets.
I cannot over-emphasize the vital role played by the spectacle of organized sport for the man in the street. Only in the arena can he get a taste of a better society. Only in the arena, amidst the cheers of winning or the tears of defeat, can he feel the bond uniting him to his fellow man. Only here can he experience the respect for law and justice that is so often suppressed in the daily need to earn a dollar. The exposure of more people to professional sport is of overriding public importance and for the public welfare.
I believe that the decision reached here is supported by the overwhelming preponderance of principle, philosophy and sounder legal authority.
There is no genuine issue of a material fact concerning the question of a valid public purpose of the act which requires a plenary trial. It is my conclusion that as a matter of law the Authority and the complex itself clearly serve such a public purpose.

IV The Financing: Appropriation-Dedication  Debt Clause
A grave challenge is mounted against the act by the contention that it violates the appropriations and debt limitation provisions of N.J. Const. (1947), Art. VIII, § II, pars. 2-3. These provisions are as follows:
*494 2. No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; except that when a change in the fiscal year is made, necessary provision may be made to effect the transition. No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor.
3. The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. * * *.
Although the basic thrust of their contentions is the same, Monmouth Park and Cheval take different routes which reflect some area of disagreement between the two as to what are precisely the alleged infractions. According to Monmouth Park, the act must fall because it seeks to finance an autonomous authority by the use of general state revenues, i.e., the pari-mutuel tax, N.J.S.A. 5:10-7(f)[1], without *495 an annual appropriation. Cheval concentrates his fire on the alleged dedication of the pari-mutuel tax in itself. This, it is alleged, is an irrevocable allocation which serves to bind the hands of succeeding Legislatures to the extent that they will be unable to utilize the revenue as they might see fit. To Cheval it is not material whether the dedication involves a major tax revenue. It is the dedication that is prohibited, and the amount thereof is of no import. Both parties agree that the question presented is a novel one, although each claims to be strongly supported by several of the decisions I will evaluate.
It can be seen that the two claims of unconstitutionality involve both the dedication-appropriation sections of the State Constitution as well as the debt provisions. Although I shall discuss the constitutional attack concerning the racing provisions of the act in another section of this opinion, I must simultaneously touch upon that subject in this portion because it is alleged that gambling revenues are related to the dedication-appropriation issues. Consequently, all three legal positions will be discussed in a consolidated fashion herein.
As concluded in the preceding portion of this opinion, the construction and operation of this sports complex compose a state project for a public purpose. While it is well established that a public corporation, notwithstanding that its very existence is dependent upon the State, is an independent entity in the eyes of the law, New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 (1949), this does not detract from its public nature. It does not matter that for administrative, legal and financial reasons the fulfillment of a state project is entrusted to an autonomous body created by the State. Behnke v. New Jersey Highway Authority, supra, 13 N.J. at 29.
*496 In New Jersey Turnpike Authority v. Parsons, supra, where the appropriations clause was not an issue, the Authority brought a declaratory judgment action to determine the constitutionality of the New Jersey Turnpike Authority Act, N.J.S.A. 27:23-1 et seq. The main thrust against the validity of the legislation revolved about what is commonly known as the "debt clause" of the 1947 Constitution. N.J. Const., Art. VIII, § II, par. 3. In particular, it was argued that the Authority's bonds created debts or liabilities which would exceed one percentum of the total state appropriation for the fiscal year. In setting aside this challenge, Chief Justice Vanderbilt had only to look to the statutory language which specifically states that the Authority's bonds "shall not be deemed to constitute a debt or liability of the State ... or a pledge of the faith and credit of the State." N.J.S.A. 27:23-2; New Jersey Turnpike Authority v. Parsons, supra 3 N.J. at 242. This language is virtually identical to that of section 10(g) of the Act under consideration. N.J.S.A. 5:10-10(g). Similarly, both statutes contain a provision to the effect that each bond or note shall contain on its face the legend that only the Authority is obligated for the payment of principal or interest. Counsel nevertheless contends that the State of New Jersey has pledged its credit by the Act. I disagree with this position.
Monmouth Park relies heavily on Behnke v. New Jersey Highway Authority, supra, 13 N.J. 14. There a taxpayer brought suit to challenge the constitutionality of legislation related to the State's role in the financing of the Garden State Parkway. Specifically, in the general election of 1952 the voters approved legislation whereby the State would act as guarantor of payment of the principal and interest upon bonds not to exceed a certain amount. On appeal from a judgment on the pleadings plaintiff unsuccessfully argued that this constituted a loan of the State's credit, in violation of N.J. Const. (1947), Art. VIII, § II, par. 1, which reads: "The credit of the State shall not be directly or indirectly loaned in any case."
*497 The Behnke court reasoned that paragraph 1 must be read in light of paragraph 3, which modifies the strict prohibition of paragraph 1. That is, the State's credit can be utilized provided that the requirements embodied in the debts or liabilities provision are met. 13 N.J. at 28. The State's posture in Behnke, unlike the situation in Parsons, was one of liability if the Highway Authority did not fulfill the conditions for which it had covenanted on its bonds.
An additional argument was raised in Behnke that was not considered in Parsons. The contestants claimed that the appropriation violated N.J. Const. (1947), Art. VIII, § II, par. 2, in that it appropriated moneys for years to come. The Chancery Division, from whence the matter was certified, found no violation of this constitutional provision. The trial court found that the appropriation of motor fuel taxes as well as the section providing for the assessment and taxation of real and personal property was "not a general appropriation law covering one fiscal year only." 25 N.J. Super. 149, 168 (Ch. 1953). However, the legislation was saved on the grounds that it fulfilled the requirements of paragraph 3 by providing the ways and means of discharging the debt. The Supreme Court was in basic agreement and commented that paragraphs 2 and 3 must be read together, the former general provision being qualified by the latter specific provision. 13 N.J. at 31.
Monmouth Park points to the portion of the lower court's opinion wherein it asserts that had the appropriation been confined to one fiscal year, the statute would have violated N.J. Const. (1947), Art. VIII, § II, par. 3. It contends that but for the Article VIII debt limitation provisions, the court would have concluded that the pledge of motor fuel taxes to the Authority would have violated the appropriations provision, N.J. Const. (1947), Art. VIII, § II, par. 2. Hence, since paragraph 3 is inapplicable to the act under consideration, the appropriation of pari-mutuel taxes for years to come violates the Constitution.
*498 A careful reading of the lower court decision does not sustain that logic. The court held that paragraph 3 would have been contravened if appropriations were made in one fiscal year for the payment of interest on the bonds which the State guaranteed. It did not direct its attention as to whether paragraph 2 would have been offended had the State appropriated future moneys for some other public purpose. If anything, the court's decision, which was subsequently affirmed by the Supreme Court, indicated that revenues can be dedicated for future years for certain purposes. Indeed, the motor fuel tax revenues were so dedicated in that case. This opinion, however, is not bottomed on that observation. That issue will be considered subsequent to my discussion of the remaining cases.
McCutcheon v. State Building Authority, 13 N.J. 46 (1953), should be considered next. The Legislature passed an act which created the State Building Authority for the purpose of providing additional buildings for the State and its agencies. The standard method of financing by the issuance of the Authority's bonds was employed. In brief, the Authority would lease its buildings to the State and its agencies. On appeal from a judgment on the pleadings the Supreme Court, in a 5-2 decision, struck the enactment, holding that what purported to be a lease was in reality "an installment purchase by the State," and, since the matter was not submitted to the people pursuant to the debt limitation provision, N.J. Const. (1947), Art. VIII, § II, par. 3, the Constitution was violated.
McCutcheon's range was considerally abridged in Clayton v. Kervick, 52 N.J. 138 (1968). On appeal from a summary judgment below, the Supreme Court, speaking through Justice Jacobs, upheld the validity of the New Jersey Educational Facilities Authority, N.J.S.A. 18A:72A-1 et seq., which had been enacted in response to a committee report concerning the grave inadequacy of the State's higher education system. That Authority was authorized to issue bonds in much the same manner as the Turnpike Act and the act *499 under consideration provide. N.J.S.A. 18A:72A-10. The Authority was authorized to construct facilities for participating educational institutions and to lease and sublease the facilities. Although the mechanism employed seemed strikingly similar to that in McCutcheon, Justice Jacobs, relying heavily on the dissenting opinion in that case, distinguished the factual situation on the ground that the generating source for revenue would not be the State Legislature, as in McCutcheon. Therefore, the act did not run afoul of the debt provision of the Constitution. Clayton v. Kervick, supra, at 154.
Clayton is viewed differently by Monmouth Park and Cheval. Monmouth Park reads Clayton as a case involving dormitory rent, which is not a major tax source and which did not involve the appropriation question. Cheval believes that the parties stipulated that dormitory rents were not to be considered state revenues, and thus avoided the appropriation question. Again, to Cheval the source of the revenue is unimportant, while the alleged dedication is the controlling factor.
While McCutcheon was not expressly laid to rest by Clayton, its demise was signalled by the recent case of Holster v. Board of Trustees of Passaic County College, 59 N.J. 60 (1971). Holster posed the question of the constitutionality of the method of financing set forth in the County College Bond Act, N.J.S.A. 18A:64A-22.1 et seq. This statute provided that the State, by appropriation, would meet principal and interest payments on bonds issued by participating counties. Notwithstanding this, the statute expressly stated that the bonds or notes should not be deemed a debt or liability of the State or a pledge of its credit. Repulsing a challenge that the act was violative of the debt limitation clause, the court held the bonds were not obligations of the State since it was not compelled to discharge the debts and liabilities. The court, however, did recognize that there was "a strong likelihood" that legislative appropriations would, in fact, be made in payment of the debt.
*500 It is now evident, therefore, that the court has departed from the majority opinion in McCutcheon. In the course of his decision in Holster, Justice Mountain observed: "Although the majority opinion in McCutcheon was not expressly overruled, it obviously retains little vitality today." 59 N.J. at 73 Holster cited McCutcheon for the principle that "one Legislature cannot charge succeeding Legislatures with the duty of making appropriations." 59 N.J. at 71, citing 13 N.J. at 66.
Holster, then, completes the cycle and returns us to the question left unanswered subsequent to the discussion of Behnke, infra. Does the act violate the aforementioned provisions of the Constitution and, in effect, tie the hands of succeeding legislators for years to come?
Basically it is argued that N.J. Const. (1947), Art. VIII, § II, par. 2, requires all general state revenues to be paid into the State Treasury for the purpose of meeting annual appropriations. This is said to be so notwithstanding the constitutional framers' rejection of a provision that would have required all revenues to be so paid, 1 Proceedings of the New Jersey Constitutional Convention of 1947, at 151 (for a constitution containing such a provision, see Missouri Const., Art. 3 § 36), and notwithstanding the failure to enact a provision either permitting or prohibiting the dedication of funds, 2 Proceedings, at 1673-1679; 5 Proceedings, at 697-698, 648-650.
Counsel further submit that the language in the appropriations provision effectively forecloses the power to dedicate and prohibits the expenditure of revenue other than through annual appropriations. Support for this position is said to be found in the second sentence of paragraph 2, and, in particular, emphasis is placed upon the phrase "all moneys for the support of State government and for all other State purposes." It is claimed that funds used for the support of State Government and for all other state purposes are to be provided for in one annual appropriations bill. The act, it is contended, violates the Constitution, *501 since it shortcircuits the Legislature by directly transferring a portion of the general state revenue to the Authority.
At first blush the argument is a compelling one. However, a closer examination of its premise and the appropriations provision reveals otherwise. The fallacious premise is that there exists here an irrevocable dedication of general state revenue without annual legislative supervision through the appropriation process. From a careful reading and evaluation of the authorities, it is clear that revenue derived from horse racing is not ipso facto general state revenue unless the Legislature or the Constitution states otherwise. See, McArthur v. Smallwood, 225 Ark. 328, 332, 281 S.W.2d 428, 431 (Sup. Ct. 1955). The Legislature has spoken to the extent of 1/2 of 1% of the pari-mutuel pool as well as any balance remaining after other purposes are met. N.J.S.A. 5:10-6(b) (6), 7(f). The appropriations provision of the state Constitution requires no more. I cannot agree that the provision means that all revenues of State Government be paid into the General Fund when such a proposal was rejected by the framers. See, 1 Proceedings, supra, at 151.
The first sentence of the provision simply states and means that no money shall be drawn out of the State Treasury except by appropriation. The second sentence describes the manner of appropriations, to wit, one appropriations law shall encompass the expenditure of moneys from the Treasury for state purposes. This is not relevant, however, to the case where the public purpose is effectuated through an agency that is not dependent upon the Legislature for annual appropriations. The method of financing in this act is analogous to that used in financing the Turnpike, N.J.S.A. 27:23-1 et seq., and dormitory facilities N.J.S.A. 18A:72A-1 et seq. In effect, the Legislature has set up an authority which will be self-sustaining and may look only to the revenue derived from its own operations.
*502 If nothing else were said, our inquiry would end here based upon the decisions in Parsons, Clayton and Holster, supra. However, Monmouth Park argues that the language of the 1939 gambling amendment to the Constitution of 1844 (N.J. Const. (1844), Art. IV, § VII, par. 2, as amended), and the appropriations provision of the present Constitution of 1947 contain identical language in part and should be read in the same fashion. That is, each provides that revenues must be used "for the support of the State government." From this it is concluded that the revenue that will be derived by the Authority must find its way into the General Fund.
A close scrutiny of the language of the gambling amendment will demonstrate that this conclusion is incorrect. In pertinent part, it permitted pari-mutuel gambling "from which the State shall derive a reasonable revenue for the support of government." Considering first the word "State," clearly this is not synonymous with the General State Fund. It is a term that generally includes the executive, legislative and judicial branches of government. Commonly, it also encompasses subdivisions, bureaus, agencies and instrumentalities thereunder. The Authority points out that it is a state instrumentality within the Department of Community Affairs and within the term "State," notwithstanding that its debts are not those of the State.
The term "government" likewise is a broad one and includes the State, counties and municipalities, as well as the particular departments of each. As can be seen from the discussion of "public purpose," government, on each level, can involve itself in a public purpose. The Authority is a public corporation constituted for a public purpose. It is not a private association or entity. Thus, any revenue it receives from its operations and which it utilizes in furtherance thereof is revenue received by a state agency "for the support of government." Moreover, revenue received by a municipality in lieu of taxes, pursuant to sections 18(b) and 18(c) of the act, is revenue derived in part from *503 gambling and paid out "for the support of government" on the municipal level. Finally, there is no dispute that all revenue required to be paid into the General State Fund pursuant to the act is revenue "for the support of government."
Lastly, there is nothing pertaining to the word "revenue" which suggests that it means only money which is paid into the State Fund. The sources from which revenue is derived are numerous. They include property taxes, inheritance taxes, sales taxes, highway tolls, admission charges to state parks and beaches, etc. Not all of these are paid into the State Fund.
Thus, it is clear that there is no constitutional mandate that pari-mutuel and other revenues be paid into the State Fund. What of the fact that the revenue must be reasonable? The answer to this inquiry presents no problem because all the revenue generated, when applied pursuant to sections 6(b) (application of all revenues received from the complex) and 7(f) (1/2 of 1% of pari-mutuel pools to the General State Fund), will be for the State and the support of government. Indeed, it would not have been fatal if the Legislature had chosen not to enact section 7(f). A fortiori, I find no merit in the argument that the percentage fixed in 7(f) is palpably unreasonable.
The challengers seem to lose sight of the fact that the Authority is not merely the racetrack. While it is true that the track is the financial catalyst, it is nevertheless only a part of a complex which will include a stadium, exposition halls, recreation areas, as well as various other facilities. Thus, any comparison percentage-wise of payment made to the State is inequitable and inaccurate. Nevertheless, the Authority chooses to argue this point legally, and I believe it comes out quite well. I shall recount several examples it hypothesizes to demonstrate the strength of its position. If the new track realizes a "total handle" equal to Monmouth Park's in 1971-1972, its initial payment to the State Fund will be $670,000. However, this figure is probably very conservative *504 when one considers the track's location, the population density and the number of probable racing days. Counsel for Monmouth Park has filed an affidavit that 30 million dollars would be realized in New Jersey from this track. If this is the fact, the initial payment to the State Fund would truly be substantial. In any event, it is not palpably unreasonable.
Alternatively, Monmouth Park suggests an approach wherein the total contribution from all tracks should be considered. This would seem to be in accord with the 1939 amendment, which speaks of reasonable revenue derived from pari-mutuel wagering in general. As Monmouth Park well knows, the State may require a different percentage to be paid from the various tracks if the basis for the distinction is reasonable. State v. Garden State Racing Ass'n, 136 N.J.L. 173 (E. & A. 1947). In that case two of the three tracks then existing, Monmouth Park and Atlantic City Racing Association, were permitted a two-year grace period during which time they made no payment of "breaks" (N.J.S.A. 5:5-64) to the State, unlike the defendant Garden State Racing Association. It would seem, therefore, that the State could exempt a track from some payment, provided the basis was rational and provided the State derived reasonable revenue from the paying tracks.
In light of this, let us consider the effect of the fact assumed by all arguendo, that the new track will injure Monmouth Park financially, causing a decrease in Monmouth Park's payment to the Fund which will not be made up by the payments made by the Authority to the Fund. The Authority's example recites that the average contribution of each of the four tracks is approximately nine million dollars. Assume that each decreases to seven million dollars when the new track commences operations. Can it be said that 36 million dollars from four tracks is reasonable while perhaps 35 million dollars from 5 is not? Or can it be said that nine million dollars per track is reasonable, but seven million dollars is not? I agree with the Authority's position that in the absence of an extreme diminution of the revenue *505 derived from all pari-mutuel wagering, it clearly cannot be said that the act reduces the revenue derived by the State Treasury from gambling to an unreasonably small amount.
In summary, it can be seen that the challengers' reliance on Behnke v. New Jersey Highway Authority, supra, is misplaced. Behnke involved a situation where the State guaranteed payment of the bonds of the Highway Authority by means of appropriations for the life of the bonds. It was determined that this did not violate Art. VIII, § II, par. 2 of the 1947 State Constitution. Behnke at 13 N.J. 30. The act under study provides for no appropriation other than the initial 1.5 million dollars which will be repaid.[1a]
Monmouth Park also cites State ex rel. Meyer v. Steen, 183 Neb. 297, 160 N.W.2d 164 (Sup. Ct. 1968), as authority for its position. This was a suit brought to determine the validity of the 1967 Games and Parks Commission State Headquarters Construction Act. Pursuant thereto the Commission was empowered to construct a headquarters to be financed by bonds and notes payable from the State Game Fund. This fund consisted of revenues generated from the sale of hunting, trapping and fishing licenses and permits, and was earmarked for the preservation of wildlife although subject to legislative control. The Supreme Court of Nebraska struck down this scheme as an attempt to make a continuing appropriation of the revenue derived from the sale of permits and licenses.
*506 The Authority concedes that Steen is contrary. With all due respect to the Nebraska court's reasoning, I do not believe the opinion to be in accord with our Constitution or with present-day fiscal realities. But despite the concession, Steen is distinguishable. It involved an attempt to dedicate revenue from a fund which was subject to legislative control notwithstanding its purpose. Under the act there is no continuing appropriation, and no part of any fund will be appropriated in futuro.
Monmouth Park, Cheval and the Authority all cite the New York Court of Appeals decision in Saratoga Harness Racing Association v. Agriculture & New York State Horse Breeding Development Fund, 22 N.Y.2d 119, 291 N.Y.S.2d 335, 238 N.E.2d 730 (1968). In that case plaintiff attacked the constitutionality of legislation which created an agricultural and horse breeding fund as a public corporation "within the harness racing commission." The private racing associations were required to pay the fund a percentage of the "breaks." The majority of the court, speaking through Judge Keating, found no impediment in the constitutional provision that "the state shall derive a reasonable revenue for the support of government." The fund was held to serve a public purpose. Furthermore, the majority found no transgression of the appropriations law, for "not every fund made up of public moneys raised through taxation or otherwise comes within the purview of [the appropriations law]." 22 N.Y.2d at 123, 291 N.Y.S.2d at 338, 238 N.E.2d at 733. The dissenters did not interpret the above provision in this fashion, and held that the fund was impaled on the horns of a constitutional dilemma. That is, if it is "a State agency receiving and disbursing State revenues, the legislative scheme, permitting disbursement without appropriation, violates [the appropriations law]." 22 N.Y.2d at 127, 291 N.Y.S.2d at 341, 238 N.E.2d at 735. Cheval reads the case as consistent with its contention of binding future legislatures, since it submits that the "diversion" of racing revenues from the State Treasury was not irrevocable and thus *507 not beyond the appropriations power of succeeding Legislatures. The decision itself, although helpful, does not provide a complete solution, for it is distinguishable on its facts. The act under consideration does not create a public corporation sustained by revenues from private tracks.
Several additional arguments should be included. Monmouth Park submits that regardless of the result reached on the appropriations argument, the debt limitation clause is contravened. It is urged that general state revenues cannot be used to satisfy the Authority's debt, absent a compliance with N.J. Const. (1947), Art. VIII, § II, par. 3. Cheval, citing Parsons, argues that the Authority "cannot blow hot and cold in the same breath; it either is an autonomous corporation or it is not." 3 N.J. at 247. That is, if the Authority is autonomous and its debts are not the State's debts, then its revenues cannot be "for the support of government," as required by the gambling amendment. If they are, then, of necessity, Cheval claims the appropriations provision is contravened, as is the debt clause.
This argument has already been answered in large part in those portions of the opinion discussing the gambling provision and the General Fund. Some further observations are necessary. First, the quoted language from Parsons is dictum, for there was no appropriation to the Turnpike Authority. The dictum had its foundation in Wilson v. State Water Supply Comm'n, 84 N.J. Eq. 150 (E. & A. 1915), where the majority of the court struck down, as violative of the debt clause, legislation which would have permitted a state agency, the State Water Supply Commission, to purchase a tract of land to be secured by a mortgage. Wilson has been greatly limited in its impact by the recent decision of Justice Mountain in Holster, supra, 59 N.J. at 67-68, which discussed favorably the dissenting opinion in Wilson.
Secondly, an analysis of the reality of the situation demonstrates that the debt limitation argument, while perhaps technically appealing, must fail. The purpose underlying *508 the debt clause is to prevent one Legislature, in the absence of approval by referendum, from saddling future Legislatures with obligations. Tilton, "Constitutional Limitations on the Creation of State Debt," 2 Proceedings of the N.J. Constitutional Convention of 1947, at 1708; Clayton v. Kervick, supra, 52 N.J. at 146. Where the debts of an Authority are not the State's debts, there will be no necessity for future appropriations. Thus, there need be no concern over the clause. In viewing the concept of a public authority, it is obvious that the entity is a creature of the State, notwithstanding its independent status. It clearly serves a public purpose and is independent only for purposes of its debts not being state obligations. See New Jersey Mortgage Finance Co. v. McCrane, 56 N.J. 414 (1970); N.J.S.A. 17:1B-1 et seq. As the Authority puts it, it is conceptually possible for the Legislature to create a state agency to carry out a state public purpose, the debts of which are not state debts within the meaning of the debt limitation clause. Justice Heher in Behnke clearly points up the reason for such arrangements:
The construction and operation of this toll facility compose a state project for public use, and it does not matter that for administrative reasons deemed good and sufficient the fulfillment of the project was entrusted to an autonomous body created by the State. The Authority is but the instrument by which the work is to be accomplished; the highway and all its property are held for the State; the corporate body exercises a public function on behalf of the sovereign, and is subject to control and dissolution by the sovereign which gave it being conditioned only upon observance of the constitutional guaranties against the impairment of the obligation of contract. New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 (1949). [13 N.J. at 29].
I find the act does not violate Art. VIII, § II, pars. 1, 2 and 3.

V The Racing Provisions
A third attack is concentrated on the act's racing aspects. N.J. Const. (1947), Art. IV, § VII, par. 2, provides:
*509 No gambling of any kind shall be authorized by the Legislature unless the specific kind, restrictions and control thereof have been heretofore submitted to, and authorized by a majority of the votes cast by, the people at a special election or shall hereafter be submitted to, and authorized by a majority of the votes cast thereon by, the legally qualified voters of the State voting at a general election * * *. [Emphasis added].
Monmouth Park and other challengers argue that this constitutional provision has been violated by the act. In particular, it is contended that: (1) the State may not operate a racetrack; (2) the Authority may not be excepted from rules and regulations of state racing laws applicable to privately owned and operated racetracks, and (3) all revenues from racing, or at least a reasonable portion thereof, must go into the State Treasury.
The challengers' argument as to (3) has been disposed of under the appropriations-dedication portion of this opinion. Legal contentions 1 and 2 will now be evaluated.
In order to place these issues in proper perspective, a brief review of the history of gambling in New Jersey is necessary. Not surprisingly, gambling has roots that trace back to England and the common law. In fact, in colonial days and in the early days of the Republic, the lottery was a common source of revenue for schools and churches. (For a review of the laws of lotteries, see Chief Justice Vanderbilt's opinion in Lucky Calendar Co. v. Cohen, 19 N.J. 399, 410 (1955) citing Dombrowski v. State, 111 N.J.L. 546, 548 (Sup. Ct. 1933)). Dombrowski, at 548, relates that notwithstanding this tradition, legislation was passed in 1797 declaring the lottery a common nuisance. Shortly thereafter, in 1815, an inroad was made upon the 1797 statute by an act which permitted the Union Turnpike Company to utilize a lottery for payment of debts due and owing from construction of the turnpike. Id. Later, however, in 1844, the following prohibition on lotteries was enacted by the delegates to the Constitutional Convention held that year:
*510 No lottery shall be authorized by this state; and no ticket in any lottery not authorized by a law of this state shall be bought or sold within the state. [N.J. Const. (1844), Art. IV, § VII, par. 2]
This prohibition extended only to lotteries and not to other forms of gambling. A total ban was subsequently effected by constitutional amendment in 1897:
No lottery shall be authorized by the legislature or otherwise in this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished. [1 Comp. Stat., 1xix, Dombrowski v. State, supra, at 548]
The bounds of the 1897 amendment were tested in 1935 in Gimbel v. Peabody, 114 N.J.L. 574 (Sup. Ct. 1935). In Gimbel, emergency legislation had been passed purporting to authorize parimutuel dog racing. Pursuant thereto Pennsauken Township adopted a resolution leasing lands for the purpose of conducting dog racing. The legislation was struck down as unconstitutional since it flew in the face of the 1897 amendment. The court rejected the argument that a finding of financial emergency should operate to sustain the act and, in effect, suspend the operation of the applicable criminal law. Id. at 576.
The year 1939 witnessed a partial retreat from the total prohibition of the 1897 amendment; by special election, the people approved the following constitutional amendment:
It shall be lawful to hold, carry on, and operate in this State race meetings whereat the trotting, running or steeplechase racing of horses only may be conducted between the hours of sunrise and sunset on week days only and in duly legalized race tracks, at which the pari-mutuel system of betting shall be permitted. No lottery, roulette, or game of chance of any form shall be authorized by the Legislature in this State, and no ticket in any lottery shall be bought or sold within this State, or offered for sale; nor shall pool-selling, book-making, or gambling of any kind be authorized or allowed within this State, except pari-mutuel betting on the results of the racing of horses only, from *511 which the State shall derive a reasonable revenue for the support of government; nor shall any gambling device, practice, or game of chance, or pari-mutuel betting thereon now prohibited by law, except as herein stated and otherwise provided, be legalized, or the remedy, penalty, or punishment now provided therefor be in any way diminished. [N.J. Const. (1844), Art. IV, § VII, par. 2, as amended; emphasis added]
Shortly after the adoption of the amendment the Legislature enacted N.J.S.A. 5:5-22 et seq., which established the New Jersey Racing Commission with jurisdiction over all entities involved in horse race meetings.
The 1947 Constitutional Convention saw the problem of gambling in New Jersey again brought to the forefront. The Committee on the Legislature considered five possible alternatives concerning the gambling clause. These ranged from making no reference whatsoever to gambling in the Constitution, to prohibiting gambling, and to liberalizing the 1939 clause. Ultimately, of course, the first paragraph of the present section was adopted, limiting gambling to cases where approval is expressed by the majority of the votes cast in a state-wide election, and where the specific kinds, control and restrictions of the same are provided for.
In 1953, by general election, the above section was amended so that certain specified groups, e.g., veterans, charitable, religious, and fraternal organizations, could conduct bingo and raffles, provided a majority of the voters of the particular municipality affirmatively approved the same at a general or special election. See Allendale Field and Stream Ass'n v. Legalized Games, etc., 41 N.J. 209, 211 (1963).
And, a further change occurred in the 1966 general election, with the people approving N.J.S.A. 5:5-84, which permits night and Saturday racing.
The most recent amendment took place in 1969 where, in the general election, the electorate approved the present lottery. N.J. Const. Art. IV, § VII, par. 2(C). The net proceeds of the lottery are channeled into state institutions and aid for education. Its financial success is undisputed.
*512 Such is the history of the gambling provisions of the New Jersey Constitution. It is evident that while gambling has been subject to continuous restrictions, it has not been anathema to our Constitution or people.
Returning to the language of the present gambling clause, I find that it clearly lends itself to the interpretation urged on behalf of the Authority. The clause, as enacted, provided that no gambling was to be permitted unless the specific kind, restrictions and control thereof had been "[t]heretofore" approved by the people at a special election. Pari-mutuel horse racing had been "[t]heretofore" approved in 1939, with the adoption of the amendment to N.J. Const. (1844), Art. IV, § VII, par. 2. The specific kind and control of racing in that amendment was incorporated into the 1947 Constitution. See the remarks of Senator Lewis at the 1947 Constitutional Convention, Proceedings, op. cit., at 429.
A reading of the 1939 provision reveals the following "specific kind and control" of gambling: (1) trotting, running or steeplechase racing of horses, (2) between the hours of sunrise and sunset, (3) on weekdays only, (4) in duly legalized racetracks, (5) with the pari-mutuel system of betting, (6) the State is to derive reasonable revenue therefrom for the support of government.
Any other type of gambling, or any variation as to the "kind, restrictions and control" of pari-mutuel horse racing, would thereafter have to be authorized by the people at a general election.
Thus, in 1966, the people approved nighttime and Saturday racing, which constituted a change in restrictions and the kind of racing initially approved in 1939.
The act complies in every respect with the previously listed requirements. Section 5(o) empowers the Authority to "conduct horse race meetings" and "operate a pari-mutuel system." Section 7(b) mandates that such meetings be conducted *513 in compliance with, among other provisions, N.J.S.A. 5:5-47. As for the requirement of a "duly legalized racetrack," it has been held that it is:
* * * such a track as is designated in a permit, extant and unrevoked, issued by the New Jersey Racing Commission in accordance with its rules and regulations and under the provisions of the statute (grounded in the constitution). [Wight v. N.J. Racing Commission, 128 N.J.L. 517, 524 (Sup. Ct. 1942)]
To the extent that the act complies with the Constitution in all other respects, why, as the challengers contend, should the State be prohibited from operating a racetrack? If the Racing Commission, a creature of the Legislature and subject to dissolution by legislative whim, can ordain a track duly legalized, it cannot seriously be argued that the Legislature itself is powerless in this regard. Just as the Legislature can delegate this power, subject, of course, to "sufficient basic standards," State v. Hotel Bar Foods, Inc., 18 N.J. 115, 124 (1955), it can perform the function itself. Regarding those standards, Justice Jacobs said in Hotel Bar Foods: "The exigencies of modern government have * * * dictated the use of general, rather than minutely detailed standards * * *" at 124.
The immediate foregoing observations are not substantially disputed. Rather, disagreement arises over section 7 of the act, which exempts the racetrack from certain requirements of the Racing Commission that a private track would have to meet under N.J.S.A. 5:5-22 et seq. In particular, it is pointed out that (1) there is no requirement in (N.J.S.A. 5:10-7(c), (d) for a referendum pursuant to N.J.S.A. 5:5-39.1; see Jersey Downs Inc. v. Div. of New Jersey Racing Comm'n., 102 N.J. Super 451 (App Div. 1968); (2) the Racing Commission is required to allot a specified minimum amount of racing days (Id.); (3) the Authority is not required to submit any form of payment or bond (Id., § 7 (d)); (4) the Authority itself determines the admissions fee (§ 7(e)); (5) the Authority shall not make *514 any breakage payment to any one by way of contribution to pari-mutuel pools (§ 7(f)) and (6) the Authority is exempt from local zoning (§ 5(x)).
Boiled down, these differences amount to a claim that Monmouth Park has been denied equal protection of the laws. The principle of law here is the same as that utilized hereafter in the discussion of general and special laws.
A showing of difference in treatment on the part of the Legislature is not enough, absent a further showing that the classification or differences are arbitrary. Wiramal Corp. v. Director of Div. of Taxation, 36 N.J. 201, 211, 212 (1961); State v. Garden State Racing Ass'n, 136 N.J.L. 173, 178 (E. & A. 1947); cf. Jersey Downs, Inc. v. Div. of New Jersey Racing Comm'n, supra, 102 N.J. Super. at 457.
It appears from the briefs and arguments that the litigants do not disagree on the basic principles of the Equal Protection Clause of the United States Constitution. The ultimate test is whether there is a reasonable or rational basis for the difference in treatment. Both sides cite Morey v. Dowd, 345 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1956):
That the Equal Protection Clause does not require that every state regulatory statute apply to all in the same business is a truism. * * * On the other hand, a statutory discrimination must be based on differences that are reasonably related to the purposes of the Act in which it is found. [at 465, 77 S.Ct. at 1350].
In McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), the test of a reasonable distinction to support the discrimination was stated: "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." As Monmouth Park itself puts it, the issue is whether the difference in treatment is related to some permissible purpose of the statute.
It is obvious that the classification or distinctions in the act are reasonable and rational. The Sports Authority is a far cry from Monmouth Park. It is a unique public agency, *515 constituted by the Legislature for a purpose which, I have held, is essential and beneficial to the public. These factors constitute a distinction  reasonable and rational  which is more than adequate to justify the Authority's exemption from the aforementioned requirements. The distinctions rest on the very nature of the Authority.
There are additional reasons for the necessity of these exemptions. They relate to the financial ability of the Authority to carry out the intention of the Legislature. Monmouth Park is a private corporation in business to make a profit. And this is as it should be. The obligations of the Authority run the gamut. Its commitment involves the operation of stadiums, a racetrack, exposition halls and other undertakings permitted by the act. The Authority must cover expenses but realizes no net profit. N.J.S.A. 5:10-6(b).
It would be legal and financial myopia not to recognize the legislative intent as to the Authority's financial problems. Its financial responsibility is far different from that of Monmouth Park. Unless a financially successful sports, recreation and exposition undertaking is reasonably assured, the executive and legislative branches' approval of this legislation would be futile. To raise more than a hundred million dollars through the sale of revenue bonds without the credit of the State of New Jersey  the repayment guarantee being limited to the success of this public undertaking  would be a virtual impossibility, as the Legislature surely realized, without certain forthcoming contractual guarantees. Thus, the Legislature granted the aforementioned exemptions in order to assure the marketability of the bonds. None of these exemptions is unusual, nor unconstitutional, nor unnecessary to achieve the complete public purpose for which the Authority was created.
In Walter Reade, Inc. v. Dennis Tp., 36 N.J. 435 (1962), Chief Justice Weintraub considered a township's claim that broad exemption in the Highway Authority Act be limited. He said:
*516 We think that view is incompatible with the evident concern of the Legislature with the fiscal success of the authorized project. The Legislature intended the entire project, including the facilities [restaurant] here involved, to be self-sufficient, and to that end provided the exemption. [at 440]
The financial facts of life as reflected in the act clearly point up the necessity of considering this statute as a whole  not solely one that pertains to racing or football. That professional football is the initial catalyst for a sound project need not be denied. It will permit the construction of a stadium which will undoubtedly be used for various types of sporting events, as well as concerts and meetings and any number of events involving large assemblages. And racing is probably the financial catalyst that permits the complex to be undertaken by the sale of revenue bonds without the credit of New Jersey being pledged. An exposition hall to house trade shows will be realized without the expenditure of tax money. There undoubtedly will be a variety of attractions. Likewise, auxiliary services to the general public will be constructed.
I have made these observations to underscore the fact that in determining whether legislation is for a public purpose, the court should consider the entire picture which encompasses the entire range of activities. The answers to the legal problems projected by the litigants should not be made based on an argument as to a racetrack or a football stadium. The act must be taken as a whole. An intelligent evaluation cannot be bottomed on the benefit of a severed, single part of the act, or the offensiveness of another.
In the case of County of Alameda v. Meadowlark Dairy Corp., 227 Cal.2d 80, 38 Cal. Rptr. 474 (Sup. Ct. 1964), defendants argued that the taking of their land for a parking lot for a racetrack at a county fair was not a taking for a public purpose. The court concluded otherwise:
Even considering, however, that the land to be taken will be a substantial auxiliary to the racing while it is used for parking, and possibly will be used directly for racing purposes later, we do not deem it *517 to be a proper judicial function to dismember the fair's functions and to evaluate the public benefit of a severed part. The serving of liquor in the fair's restaurant may be objectionable to some; the risks taken by aerialists may be offensive to others; the exhibit of modern art may be deemed useless by the admirer of the display of bovines. Variety is of the essence of a county fair. The fair must be taken as a whole. The wagering feature of the racing is not a severable one, merely because it produces the largest revenues. Activities which promote recreation of the public constitute a public purpose. [227 Cal.2d at 87, 38 Cal. Rptr. at 477-478 emphasis added]. Cf. City of Los Angeles v. Superior Court, supra.
In summary, therefore, the financial realities connected with the legislative intent of promoting a public purpose  a permissible purpose of the statute  warrant the difference in treatment. Monmouth Park concedes these reasons to be valid but, it is asserted, they do not require that the State solve the financial problems by the methods adopted, i.e., differential treatment.
A similar contention was posed in the case of State v. Garden State Racing Ass'n, supra. In that case one of three existing racetracks challenged an amendment to N.J.S.A. 5:5-64 which required any track that held a permit for over two years to pay a share of the breaks (then defined as the odd cents over any multiple of five cents, calculated on the basis of one dollar otherwise payable to a patron, L. 1946, c. 169, § 1) to the Commission. Garden State was the only track that had been operating for longer than two years, and it raised the equal protection argument. In denying relief to Garden State the Court of Errors and Appeals made several pertinent observations:
The grant of an exemption rests upon the theory that such exemption will benefit the public, and not upon any theory that it will impose a burden upon [Garden State] * * *. [I]t was the obvious intention of the legislature to aid in the financial establishment of the new tracks as well by relinquishing the State's share in the "breaks" for the first two years of operation. * * * The legislature has necessarily a wide range of discretion in distinguishing, selecting and classifying. * * * It is unnecessary for the legislature to state the reasoning upon which the classification is based or justified; it is sufficient to satisfy the demand of the constitution if the classification *518 is practical; and it is not reviewable unless palpably arbitrary. The legislature is not bound to be by any rule of absolute equality. [136 N.J.L. at 176, 177, 178, 180; emphasis added]
The burden of the challenger is a heavy one. It has not been met insofar as the equal protection attack is concerned. The distinctions which support the alleged discrimination are rational. Accordingly, the statute must be sustained.
Monmouth Park further argues that the State of New Jersey has relinquished its constitutional responsibility to regulate racetracks. This is not substantial when carefully examined. The Authority is subject to the complete regulation by the Racing Commission, with the same rules and in the same manner as Monmouth Park, with the stated exceptions. The long list of similar obligations of the Authority track and Monmouth Park need not be detailed. The exceptions in the act do not by any standard render the Authority immune from appropriate action should any type of wrongdoing occur.
It is a fact that the Legislature can and will continue to control racing as well as all gambling. It is also true that the interests of bondholders of the Authority may not be impaired while bonds are outstanding. But this does not foreclose any regulation or statute, short of the commitment to bondholders in the act. The Legislature, of course, may at any time, dissolve the Authority by making appropriate arrangements for the retirement of outstanding bonds. N.J.S.A. 5:10-4(h). Generally, control, including the power to abolish gambling, will remain with the people and the Legislature.
One additional issue raised by the challengers stems from the last requirement imposed by the 1939 amendment, which was that the State derive reasonable revenue for the support of government. It is argued that 1/2 of 1% specified in section 7(f) is not reasonable revenue. There is no need to engage in a mathematical exercise, for it is obvious that by the very nature of the complex, the government will derive reasonable revenue. This was discussed in detail under the *519 appropriation-dedication and debt limitation section of the opinion. I have held that the act serves a public purpose; therefore by definition all revenue generated is for the support of government. See infra. In connection herewith it is claimed that the State Treasury will be left "poorer" than it was prior to the advent of the State's track. The Authority, in fact, has stipulated, for the purpose of argument, that this will be so. But it maintains that it is of no legal significance. The Authority assumes the correct posture here. Once it has been determined that the exemptions accorded the state track have a rational basis, any "harm" incidental thereto that may befall the other tracks is of little moment, and the decrease in revenue flowing into the State Treasury will be of little import.
Finally, Monmouth Park claims that there is no constitutional basis for state ownership of a racetrack. It cites numerous newspaper articles reflecting the debates that preceded the 1939 amendment. In part, the point proffered is that no one ever imagined that the State would engage in such an activity. Viewed in another way, this argument opts for a prohibition upon the Legislature as to what type of an entity it can empower to conduct horse race meetings. In State v. Murzda, 116 N.J.L. 219, (E. & A. 1936), the court addressed itself to this issue, stating:
A constitutional prohibition against the exercise of a particular power is in the nature of an exception; and it is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt. The constitutional limitation upon the exercise of legislative power must be clear and imperative * * * Such * * * limitation * * * "is [not] to be established * * * by reference to some spirit that is supposed to pervade [the constitution] or to underlie it, or to overshadow the purposes and provisions expressed in its written language." [at 223]
In State v. Baldinotti, 127 N.J.L. 46 (Sup. Ct. 1941), the court stated:
*520 Our Constitution is a limitation not a grant of legislative power. And the limitation should be strictly construed. That which the legislature may not do, because it is prohibited by the Constitution, must be definite and precisely stated and may not be broadened or extended by implication or by reading into the limitation itself something that is not clearly set forth therein. [at 48]
A court cannot seek to weave a prohibition where none is spelled out. The authorization pattern in the various paragraphs of the gambling provision of the State Constitution is of paramount importance here. It reveals that when a certain form of gambling is to be limited to a specified group, that entity is clearly set forth. Thus, certain groups may conduct bingo and raffles and the State may run lotteries. The horse racing authorization clause is not so limited, and based upon the principle set forth in Murzda, supra, I find no prohibition as to public ownership of a racetrack.
The challengers' arguments with respect to the racing aspects of the act are not compelling. I find no infirmity which requires the court to strike the act as constitutionally unsound. There being no genuine issue of fact in this regard, in addition to Monmouth Park having moved for summary judgment on its motion, I find that the racing provisions of the statute are not violative of the New Jersey or Federal Constitutions.

VI The Public Trust

(A) Tidelands
Section 6 of the act authorizes the Authority to "effectuate a project to be located in the Hackensack meadowlands upon a site not to exceed 750 acres * * *." The Authority has stipulated that the projected site will include substantial acreage designated by the State to be tideland. Cheval and the Audubon Society contend that this property is vested in the public trust and cannot be conveyed, leased or utilized in any way by the State for any purpose not related to the public trust. Specifically, Cheval and Audubon *521 make a two-pronged attack. First, they urge that the proposed racetrack usage is in violation of the public trust. Secondly, they argue that section 17 of the act permits the granting, leasing or conveying of "meadowlands, riparian lands or lands under water and similar lands" without compensation.
The New Jersey Const. (1947) Art. VIII, § IV, par. 1, concerns itself with the perpetual fund for the support of free public schools.[1b] By statute, N.J.S.A. 18A:56-5 provides:
All lands belonging to this state now or formerly lying under water are dedicated to the support of public schools. All moneys hereafter received from the sales of such lands shall be paid to the board of trustees, and shall constitute a part of the permanent school fund of the state.
N.J.S.A. 18A:56-6 provides similarly for income arising from leases of such lands.
In Henderson v. Atlantic City, 64 N.J. Eq. 583 (Ch. 1903), the court declared unconstitutional an act which provided that tidelands might be conveyed to a municipality for purposes of a public park for a nominal consideration. Therefore, it is clear that were Cheval's contention sound, section 17 of the act would fall as violative of the constitutional and statutory provisions pertaining to the School Fund. But section 17, contrary to Cheval's interpretation, provides for payment to the State. While no lands have yet been conveyed and the issue theoretically is not ripe for review, I will consider the entire tideland argument at this time in view of the Authority's stipulation No. 10. There is no factual dispute, and counsel for Cheval agreed at oral argument that this is a legal issue to be decided by summary judgment.
*522 The following statutory authorities are relevant to the contemplated conveyance. N.J.S.A. 13:1B-13.7(b) provides that an "instrumentality of the State * * * may apply to the [Natural Resource Council] for a conveyance * * * of the State's interest in the meadowlands * * *." N.J.S.A. 13:1B-13.8(c) states that the Hackensack Meadowland Negotiation Board shall fix the consideration for the conveyance. Pursuant to N.J.S.A. 13:1B-13.9, the Natural Resource Council "shall approve an application for conveyance, if * * * it is satisfied that the conveyance will be in the public interest." N.J.S.A. 12:3-7 declares that riparian lands may be conveyed for a reasonable compensation, which shall be fixed by the Natural Resource Council, the Governor and the Attorney General.
N.J.S.A. 13:1B-13.13 is addressed to the aforementioned constitutional provision:
The net proceeds from the sale, lease or transfer of the State's interest in the meadowlands shall be paid to the Fund for the Support of Free Public Schools established by the Constitution, Article VIII, Section IV, after deducting from the net proceeds any expenditures of the Hackensack Meadowlands Development Commission for reclaiming land within the district. The amount of said deduction for reclamation shall be paid to the Hackensack Meadowland Development Commission.
Clearly, the statutes cited provide for compensation to be paid to the Fund for the Support of Free Public Schools. This is in exact accord with the New Jersey Constitution. The deduction of costs of reclamation from the proceeds is no argument for ambiguity. There is no confusion as to the meaning of this portion of the legislative enactment.
Cheval and Audubon answer that section 17 must rise or fall on its own, since no reference is made therein to the statutes just discussed. Such a ruling would be contrary to a cardinal rule of construction. The Legislature is presumed to be thoroughly conversant with its own enactments relating to the same or similar subject matter. Jacobs v. New Jersey State Highway Authority, 54 N.J. *523 393, 401 (1969). Former Chief Justice Vanderbilt aptly explained the guiding principle in Appeal of New York State Realty & Terminal Co., 21 N.J. 90 (1956):
It is fundamental that statutes cannot be considered in a vacuum. They must be understood in their relation and interaction with other laws which relate to the same subject or thing, they must be construed together with these related sections in order to learn and give effect to the true meaning, intent and purpose of the legislation as a whole. [at 98]
To follow this principle is not to rewrite the particular section. It is only to proceed in a logical and orderly fashion to effectuate the purpose of the Legislators. So viewed, section 17 involves no factual question and is violative of no constitutional provision. The consideration received for any grants of state-owned tidelands pursuant to the pertinent statutory provisions is dedicated to the School Fund. N.J. Const. (1947), Art. VIII, § IV, par. 3; N.J.S.A. 18A:56-5; N.J.S.A. 13:1B-13.13.
The argument raised in regard to the tidelands, however, goes much deeper than the just compensation claim. It goes to the very core of the act, for Cheval and Audubon vigorously submit that no conveyance can be permitted in view of the proposed use by the Authority. They opt for a re-examination of the means utilized for protection of the tidelands and seek to revisit the proposition that the tidelands belong to the sovereign in trust for the people, i.e., a public trust. As they view it, the trust will be violated per se by a conveyance of the type proposed and will be further breached by the destruction of the ecological balance of the area. More broadly, East Rutherford and public counsel strongly urge that the proposed complex will have a deleterious effect, not solely on the tidelands but on the surrounding area as well. It can be seen, then, that while counsel focus on different areas, the thrust is essentially the same; to wit, the abrogation by the Legislature of its duties as trustee of the tidelands and as overseer of the people's right to a clean and healthy environment. *524 This latter position will be included in the discussion under (B) of this section, captioned "Environment and Ecology."
As stated previously, the parties have stipulated that "the projected site includes substantial acreage designated by the State to be state-owned tideland." In O'Neill v. State Highway Dept., 50 N.J. 307 (1967), Chief Justice Weintraub defined these lands as follows:
The State owns in fee simple all lands that are flowed up to the high-water line or mark. The high-water line or mark is the line formed by the intersection of the tidal plane of mean high tide with the shore. The mean (sometimes called "ordinary") high tide is defined as the medium between the spring and the neap tides. [at 323]
The genesis of the public trust doctrine can be gleaned from the opinion by Chief Justice Kirkpatrick in Arnold v. Mundy, 6 N.J.L. 1, 69-78 (Sup. Ct. 1821). There are two types of public property, one "reserved for the necessities of the state, and * * * used for the public benefit" (at 71), the other "common to all the citizens, who take of them and use them, each according to his necessities, and according to the laws which regulate their use and are called common property." Id. This common property consisted of navigable rivers,[1c] ports, bays, sea coasts, including the land under the water which could be utilized for "navigation, fishing, fowling, sustenance, and all the other uses of the water and its products (a few things excepted * * *)." Id. at 77. Since by its nature common property did not permit title to vest in the people, the common law "placed it in the hands of the sovereign power, to be held, protected, and regulated for the common use and benefit." Id. at 71. Subsequent to the American Revolution, the *525 sovereign's power vested in the people of each State, to be exercised through their representatives, the Legislature. Id at 78.
Arnold was cited favorably in the landmark decision of the United States Supreme Court in Illinois Central Railroad Co. v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892). In discussing the duties incumbent upon the State in carrying out its fiduciary duty, the court declared that there could be no abdication of the trust. However, this statement was not without qualification.
The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining. [13 S.Ct. at 118; emphasis added].
It can be seen, then, that subject to the aforementioned qualifications, there is nothing that prevents the alienability of the trust lands. The New Jersey Legislature has recognized this in its enactment of N.J.S.A. 18A:56-5 and N.J.S.A. 13:1B-13.13.
The conveyance of land envisioned in the act clearly meets the trust qualifications. As previously indicated, just compensation has been safeguarded and the proceeds will be applied to the support of free public schools. Most importantly, the conveyance will promote a purpose which has been deemed beneficial to the public. The inclusion of a racetrack in no way detracts from the public purpose character of the project. Accordingly, the conveyance of the tidelands will not violate the public trust.
I will now consider the argument raised in regard to the tidelands in its broadest and perhaps most serious impact, that is, the ecological or environmental controversy.

(B) Environment and Ecology
In fashioning their arguments, Cheval, Audubon, East Rutherford and public counsel all concede, as they must, that they are required to exhibit a right to relief. Two *526 approaches are taken, one via the Ninth Amendment, to the United States Constitution, the other via the Fourteenth.
The Ninth Amendment states:
The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.
In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the majority and concurring opinions concerned themselves with this amendment and both spoke of "penumbral rights" as rights guaranteed in addition to those specifically enumerated in the first eight amendments. One commentator has constructed the following theory:
The rule of construction embodied in the Ninth Amendment could be the foundation for a declaration by the Supreme Court of a constitutional right to an uncontaminated environment. Perhaps no principle is as fundamental as the preciousness of every human life. The Fifth and Fourteenth Amendments offer no less protection to "life" than to "liberty." Surely liberty and the various rights specifically enumerated in the Constitution are meaningless abstractions if life itself is ended through pollution's often invisible but unrelenting and imminently cataclismic environmental assault on the human body. [Esposito, "Air and water pollution: What to do while waiting for Washington," 5 Harv. Civ. Lib.  Civ. Rights L. Rev. 32, 47-48 (1970)].
Another commentator would combine the "public trust concept with the constitutional basis given by the Ninth Amendment" as a weapon in the battle against the defiling of our environment. Cohen, "The Constitution, The Public Trust Doctrine and The Environment," 1970 Utah L. Rev. 388, 399 (1970).
The theory based upon the Fourteenth Amendment is that certain civil rights, i.e., environmental rights, are being abridged by state action, in contravention of 42 U.S.C.A. 1983.
In addition, Cheval and Audubon cite other Federal statutes which reflect a growing concern with environment. *527 Principal among these is the National Environmental Policy Act of 1969, 42 U.S.C.A. 4321. This statute has given rise to at least one suit wherein citizens are seeking to restrain the dredging of tidelands. Israk Walton League v. Macchin, unreported Civil Action No. 1037-70 (D.C.N.J. p. 1071) (Cohen, J.); 8 Envmt. Rep. 218 (Current Developments 1971).
The challengers come armed with more than theory. They point to case law which they believe supports their environmental and ecological claims. The cases referred to and discussed hereafter are included in an opinion by Justice Jacobs, Crescent Park Tenants Ass'n v. Realty Equities Corp. of New York, 58 N.J. 98 (1971). But the question in Crescent Park had to do with standing to sue. This is not an issue in this case. No one has questioned the right of the parties to litigate the constitutionality of the act by filing separate suits.
In the landmark case of Scenic Hudson Preservation Conference v. FPC, 354 F.2d 608 (2 Cir.1965), cert. den. 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), various conservation groups were successful in setting aside action taken by the Federal Power Commission (FPC). This case involved the controversial "Storm King Project" wherein Consolidated Edison sought to construct a pumped storage hydroelectric project adjacent to the Hudson River. The second Circuit, in remanding, held that the FPC failed to follow its statutory mandate, which required it to consider the conservation aspects of the project. It was noted that the FPC had refused to receive certain testimony, including some pertaining to fish protection devices.
In Udall v. FPC, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967), the Secretary of the Interior challenged FPC's granting of a license to a private company for the construction of a hydroelectric power project. In remanding the matter to the FPC, the court held the record was barren of any consideration of the project's public interest, as required *528 by the Federal Water Power Act. Mr. Justice Douglas stated the public interest should be determined:
Only after an exploration of all issues relevant to the "public interest," including future power demand and supply, alternate sources of power, the public interest in preserving reaches of wild rivers and wilderness areas, the preservation of anadromous fish for commercial and recreational purposes, and the protection of wildlife. [387 U.S. at 450, 87 S.Ct. at 1724]
In Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2 Cir.1970), plaintiffs challenged the issuance of a permit to allow dredging and filling for the construction of the Hudson River Expressway. In answer to defendant's claim that one of the plaintiffs lacked standing, the court noted (at 105) that unless that plaintiff had standing at that stage of the project, it would be in a very difficult position "at some later date to overbalance the equities in favor of the State such a large commitment of public funds would engender and its legitimate concern could be irretrievably subverted even though the permit was issued unlawfully."
These decisions hold that the courts will intervene to prevent agency action in contravention of a statutory mandate to consider a project's environmental and ecological ramifications.
The Authority, for the purposes of this motion, has stipulated an assumption that a "factual issue exits with respect to the impact of a major project such as the sports complex upon the environment of the meadowlands district." However the Authority claims that the issue is premature in view of the fact that no decisions have been made and no action has been taken which will affect the environment or ecology. Cheval, Audubon, East Rutherford and public counsel submit that the issue should be considered now, since a considerable investment is contemplated. The challengers rely upon the foregoing federal court decisions in support of their argument that irreparable damage will result if they are foreclosed from a hearing at this time.
*529 I fail to discern the parallel in the case at hand. The foregoing cases and other authorities are clearly based upon statutory mandates which require the particular agency or commission to consider the conservation aspects of the project. These federal mandates support the legal holding that the applicable agency explore all issues relevant to the "public interest" before any action is taken. Each agency is required to make factual findings concerning the environmental and ecological ramifications. But, I repeat, this is the result of a statutory directive  not a constitutional mandate. All parties agree that the United States Supreme Court has not spoken on the constitutional right to a clean environment to the exclusion of various other rights. This does not mean that any one is opposed to wholesome ecology.
This court is most alert to the changing attitudes of society. I understand fully the prevailing reform in the manner we look at our problems and even in the fashion that we make decisions. I am unequivocally sensitive to the fact that we should view the law in the light of what is good for the people. There must be an awareness of the necessity for environmental balance.
The tempo of the times is such that the Ninth Amendment may carry such a constitutional interpretation. And even if this comes to pass, in the absence of statute, there is no bar to a declaration of constitutionality of this act and then the necessity for the administrative hearings as to the environmental balance. If the act is unconstitutional, there is no need for environmental hearings. Such determinations are to be made only by virtue of a constitutional act. The cases cited by counsel in support of a statement that it may be too late to wait do not involve the determination of the constitutionality of a statute.
No case has been cited to demonstrate that the time is ripe at this stage of the proceedings to consider the environmental impact of the act. Public counsel points to the alleged legislative failure during the one-day hearing to consider any of the environmental repercussions. But an *530 examination of the hearing shows this to be inaccurate. In fact, the record of the public hearing before the Senate Judiciary Committee on April 12, 1971 reveals a number of speakers appeared on behalf of various conservation and ecology interests and groups.[1d] At pages 66-70 of that transcript Commissioner Sullivan noted his concern for the environment in his answers and observations.
The act itself addresses the issue. The Legislature specifically provided in section 23 that the Authority
* * * shall consult with the Meadowlands Commission and the Department of Environmental Protection with respect to the ecological factors constituting the environment of the Hackensack meadowlands to the end that the delicate environmental balance of the Hackensack meadowlands may be maintained and preserved.
It is no answer to say that once consultation has taken place, the Authority is free to do as it wishes. Such a construction would render the section nugatory, and this obviously could not be the purpose that the Legislature had when it enacted the section. Gabin v. Skyline Cabana Club, 54 N.J. 550, 555 (1969); Gualano v. Board of Estimate, Elizabeth School Dist., 39 N.J. 300, 313 (1963). Moreover, the Legislature is presumed to know its own enactments and judicial construction thereof. Brewer v. Porch, 53 N.J. 167, 174 (1969). Thus, the Legislature was aware of N.J.S.A. 13:17-1 et seq., wherein it declared that the meadowlands area.
* * * is a land resource of incalculable opportunity for new jobs, homes and recreational sites, which may be lost to the State through piecemeal reclamation and unplanned development; that much of this acreage may be subject to redevelopment under section 3, Article *531 VIII, of the State Constitution; that the orderly, comprehensive development of these areas, due to their strategic location in the heart of a vast metropolitan area with urgent needs for more space for industrial, commercial, residential, and public recreational and other uses, can no longer be deferred. * * * [N.J.S.A. 13:17-1; emphasis added]
This section goes on to state that the area needs "special protection from air and water pollution" and that "the necessity to consider the ecological factors constituting the environment of the meadowlands and the need to preserve the delicate balance of nature must be recognized to avoid any artificially imposed development that would adversely affect not only the area but the entire State. * * *." Id.
It is from this vantage point that the act in its entirety, and section 23 in particular, must be viewed. It cannot be assumed that the Legislature, on the one hand, carefully drafted an act for the development of the area and then, on the other hand, in callous and utter disregard thereof, passed a further enactment which would frustrate the former's purpose. To opt for this result is to read the enactments in a vacuum, in utter disregard of the historical background and policy considerations. Matawan v. Monmouth Cty. Tax Bd., 51 N.J. 291, 299 (1968). Nor is there any need to indulge in any such presumptions of statutory construction in this regard. Section 2 of the act explicitly notes:
The Legislature further finds and declares that the location of a sports and exposition complex in the Hackensack meadowlands would stimulate the needed development of said meadowlands [N.J.S.A. 5:10-2]
Considering the statutes in pari materia, it becomes quite evident that the Legislature envisions a balanced development of the meadowlands.
A further observation is proper. The executive and legislative branches of the state Government have clearly made known their awareness to environmental problems by the passage of such acts as the Clean Ocean Act, Pesticide Control *532 Act, Greenacres Act, Air Pollution Control Act, etc. And it must be emphasized that N.J.S.A. 13:1D established the Department of Environmental Protection in 1970. This Department, referred to in section 23 of the act, was established and is empowered to initiate complaints, to hold hearings and institute legal proceedings, etc. N.J.S.A. 13:1D-9. Thus, the executive and legislative branches have brought the problem of environment and pollution to the door of every citizen and industry. If these are the facts, it cannot be argued that section 23 is not meaningful and not responsive to the need.
The determination of constitutionality in this case is not tantamount to a disposition concerning the environmental balance in the Hackensack meadowlands. It does not foreclose the request that the Department of Environmental Protection hold its hearings and make determinations as to environmental balance in the entire meadowlands, and specifically in the 750 acres of the complex. Such an inquiry need not be held, and determination made, prior to the court's passing upon the constitutionality of the act.
Although Cheval and East Rutherford have subscribed to a land use plan in the meadowlands for the building of factories and industrial plants in this same area without such a prior hearing, the position of counsel opposing the determination of constitutionality is simply that the trial judge should take testimony concerning the alleged ecological imbalances and the problems of pollution and environment. Thereafter, they argue, he is required to make a factual determination as to whether or not there is a sufficient environmental impact. Only after this determination, it is contended, should the court consider the constitutionality of the act. I cannot agree. A determination of constitutionality in this case and under existing law should be made before the court will consider holding such hearings.
I am satisfied that the Legislature has given much consideration to the environmental and ecological issues. In any *533 case, the issue is not relevant at this time. The day may come when a decision or act by the Authority will affect the environment. At that time judicial and/or administrative relief, if necessary, will undoubtedly be available. For example, if after consultation with the Authority, the Department of Environmental Protection claims the project will have ill effects, it has the machinery necessary to pursue the matter further. The court must presume that the Department will serve vigorously. And when building is undertaken one day, all legal requirements outlined in anti-pollution legislation, in upgrading waste treatment facilities and in maintaining an ecological balance will be enforced. I cannot agree with public counsel that the State will stand committed in the absence of an immediate environmental hearing.
I fully agree that the public should be and is entitled to a further opportunity to be heard on the environmental and ecological overtones of the legislation. Although the court may not have the facilities or power to be able to police the ecological factors, it may perhaps oversee the actions of the administrative agencies in this vital area. It is before these agencies that experts may appear if the Authority is violating any provision of environmental law. But to determine that this is not the juncture for such a hearing is not to deny the right. Every piece of legislation carries its advantages and disadvantages. The mere passage of the act is not enough to bring about judicial intervention. And this is as it should be, because in the final analysis government by judges is inferior to government by legislators.
The environmental issue is ripe for summary judgment under existing law. The judgment of the court declares that the arguments as to the trusteeship of the tidelands and the legal objections surrounding the environmental and ecological factors do not affect the constitutionality of this act.

*534 VII General or Special Law
Defendants further contend that the act contravenes the constitutional provisions dealing with special laws. The New Jersey Constitution of 1947 proscribes the enactment of special laws, absent fulfillment of certain requirements. The pertinent sections are as follows:
No general law shall embrace any provision of a private, special or local character. [Art. IV, § VII, par. 7]
No private, special or local law shall be passed unless public notice of the intention to apply therefor, and of the general object thereof, shall have been previously given. Such notice shall be given at such time and in such manner and shall be so evidenced and the evidence thereof shall be so preserved as may be provided by law. [Art. IV, § VII, par. 8]
Upon petition by the governing body of any municipal corporation formed for local government, or of any county, and by vote of two-thirds of all the members of each house, the Legislature may pass private, special or local laws regulating the internal affairs of the municipality or county. The petition shall be authorized in a manner to be prescribed by general law and shall specify the general nature of the law sought to be passed. Such law shall become operative only if it is adopted by ordinance of the governing body of the municipality or county or by vote of the legally qualified voters thereof. The Legislature shall prescribe in such law or by general law the method of adopting such law, and the manner in which the ordinance of adoption may be enacted or the vote taken, as the case may be. [Art. IV, § VII, par. 10]
It is stipulated that the requirements of passing a private or special law were not met. N.J.S.A. 1:6-1 et seq. Thus, if the legislation is special, it must fall.
Several general considerations enter into a determination of this question and bear repeating. It is well established that any legislation is presumptively valid, State v. Profaci, 56 N.J. 346, 349 (1970), and the burden of establishing invalidity rests heavily upon the challenger. Shelton College v. State Board of Education, 48 N.J. 501, 521 (1967). Whether a law is specific or general is for the judiciary to determine, and any label that might have been given by the legislators is not controlling. In re Freygang, 46 N.J. Super. 14, 26 (App. Div. 1957), aff'd 25 N.J. 357 (1957). *535 Further, a court will look to the law's "substance and necessary operation, as well as to its form and phraseology." Id., 46 N.J. Super. at 22.
The test utilized has been set forth in numerous decisions, the most recent being Alfred Vail Mutual Ass'n v. New Shrewsbury, 58 N.J. 40 (1971). There Justice Schettino reiterated the standard set forth in Harvey v. Essex County Board of Chosen Freeholders, 30 N.J. 381 (1959):
"In deciding whether an act is general or special, it is what is excluded that is the determining factor and not what is included. If no one is excluded who should be encompassed, the law is general. Another requirement of a general law is that it must affect equally all of a group who, bearing in mind the purposes of the legislation, are distinguished by characteristics sufficiently marked and important to make them a class by themselves." [58 N.J. at 49]
In Roe v. Kervick, supra, Justice Francis likewise defined a general law:
A law is "general" (1) if the class of subjects established, recognized or regulated is distinguished by characteristics sufficiently marked and important to make it a class by itself, and (2) if it encompasses all of the subjects which reasonably belong within the classification. and does not exclude any which naturally belong therein. A law is private, special or local if it arbitrarily or unnaturally excludes any subject which should be included. [42 N.J. at 233]
In accordance with the foregoing observations of Justices Francis and Schettino, we must determine whether there is an appropriate classification. For many of the reasons noted in other portions of this opinion, the class of subjects established  the construction and maintenance of stadiums and other recreational facilities, and the conduct of sports contests, exhibitions, etc.  is clearly distinguished by characteristics patently marked and important to make it a class by itself. The act overwhelmingly accomplishes all the subjects which reasonably belong within the classification. It does not exclude any subject which *536 properly, reasonably or naturally belongs in said classification. It does not exclude any subject which properly, reasonably or naturally belongs in said classification.
I have decided that the act envisions a valid public purpose; that the undertaking is an appropriate governmental function. It follows that the Legislature may determine the modus operandi to carry out that purpose.
The numerical composition of those included in the class encompassed by the legislation is not controlling. State v. Garden State Racing Assn, supra, 136 N.J.L. at 180. Thus, the fact that only a certain number of municipalities is included would not necessarily mean that the law is special, provided, of course, that the basis for including that number is reasonable. Burlington v. Pennsylvania R.R. Co., 104 N.J.L. 649 (E. & A. 1928). See Budd v. Hancock, Comptroller, 66 N.J.L. 133 (Sup. Ct. 1901), wherein the court upheld, as a general law, legislation which encompassed only one object.
What then of the classification utilized in the legislation under attack? No exclusion question is presented where there can be only one suitable location for the facility, particularly when it is to be financed without the credit of the State. The crux of the matter then becomes whether the State was rational in its selection of the site. As Judge Trautwein noted in Meadowlands Regional Development Agency v. State, supra:
The Hackensack meadowlands are unique, if only for the reason that they constitute a vast reservoir of vacant lands situated in the midst of the New York-Northeastern New Jersey metropolitan area. No other area  not even the Raritan meadows  is similarly located. Population pressures on other regions of the State may some day warrant their receiving the same legislative treatment currently afforded the Hackensack meadows. This does not mean, however, that the Legislature must defer dealing with the exigent problems of the Hackensack meadowlands until such time as conditions in other regions of the State justify similar legislative treatment. [112 N.J. Super. at 103]
*537 The parties have stipulated that on August 26, 1971 the Authority and the New York Football Giants, Inc. entered into a lease of a stadium to be built on a site in East Rutherford, New Jersey. The preliminary design includes a 75,000-seat stadium, a racetrack, an exposition hall, a hotel, and parking for a minimum of 25,000 cars and 400 buses. There is a likelihood that a 50,000-seat baseball stadium and a 20,000-seat arena will be constructed if commitments can be obtained from other professional sports teams.
The parties have further stipulated that the area is criss-crossed by rail transportation and various major highways, including the New Jersey Turnpike and New Jersey Routes 1-9, 3, 7, 17, 20 and 46. Judicial notice may be taken of the fact that in addition to the areas' close proximity to high-speed super-highways linking New York City, Westchester, Connecticut and New Jersey, it is within ten minutes of the Lincoln Tunnel (New York City).
Cheval and East Rutherford argue for a conclusion of special or private law based upon the omission of "conventions" as one of the uses of the complex and because of the designation of the general area wherein the Authority is to undertake this project. I have already made my findings as to the propriety of the classification. The argument as to designation (area) and omission of a use or uses ("conventions") will now be evaluated.
If the Legislature may determine the manner in which it will carry out what I have determined is a public project, it certainly may choose the location. This should not render the legislation special in a constitutional sense. There cannot be a lottery to determine the site of that one suitable location. The Legislative determination must be rational. Accordingly, the legislature directed the location in the Hackensack meadowlands on a site not to exceed 750 acres, thereby qualifying the Authority's power of designation. This action was most rational. Undoubtedly, the Legislature took into account all the geographical, financial *538 and other factors referred to in this opinion, as well as those stipulated by the parties concerning this location. Hence, its determination does not render the act special legislation.
A cardinal principal of construction is that broad discretion is accorded the Legislature in making a classification. Harvey v. Essex County Board of Freeholders, supra. Such classification will be struck down only upon a showing that it is arbitrary or illusory. In re Freygang, supra, 46 N.J. Super. at 24. This is not the case here, as the stipulation of the parties reveals.
In support of the additional argument that the act is special legislation because it excludes "conventions" from its enumerated proposed uses, East Rutherford points to the fact that an earlier draft of the act included "conventions," while the final draft excluded it. It therefore relies on the following excerpt from Bayonne v. Palmer, 90 N.J. Super. 245 (Ch. 1966), aff'd 47 N.J. 520 (1966).
* * * [T]he difference between a private, special or local law and a general enactment is a matter of classification. The purpose of the constitutional provision is not to prevent legislation where the Legislature decides upon a particular object, but to prevent arbitrary and discriminatory selection of a particular object where other objects existing should also be treated in like manner. If the law embraces the objects reasonably falling within a class which bears a reasonable relationship to the purpose of the legislation, and at the same time does not omit any which have equal reason to be included, the act is general. [90 N.J. Super. at 284]
In addition, reliance is placed upon certain language in Budd v. Hancock, Comptroller, supra:
A law is special in a constitutional sense when, by force of an inherent limitation, it arbitrarily separates some persons, places, or things from others, upon which, but for such limitation, it would operate. [66 N.J.L. at 135, emphasis added].
There is no substance to East Rutherford's assertion. The use of the facilities for conventions is not a "thing" or object within the meaning of the case law. To follow the argument to its logical conclusion, the law would not be a *539 general law unless all conceivable uses were provided for or permitted. For example, it would have to include facilities for hockey and soccer as well as for conventions. This is not what the act is based upon for purposes of the question at hand. The act does not group or classify, for by necessity there can be only one site. The question that has been determined is the reasonableness of that selection. The detailed uses to which the Authority may put the site are irrelevant in this regard, and have absolutely nothing to do with the determination of whether the act is general or special.
East Rutherford misconceives the case law and, in particular, the excerpts quoted above. The exclusion test simply means that no other "thing" that is a subject or an object in the group entitled to similar treatment, should be excluded from a particular classification. Thus, the inclusion of policemen and firemen's pension funds and the exclusion of other municipal employees' pension funds has been upheld as a reasonable classification. Passaic v. Consolidated Police, etc., Pension Fund Comm'n, 18 N.J. 137 (1955). And in Budd v. Hancock, Comptroller, supra, the classification considered and upheld was the office of State Commissioner of Public Roads where there was no other such office in the State. The object or subject, therefore, consists of the substance of the "thing" comprising the classification or group. The words are used to cover the situation where a classification is not based upon the grouping of persons or geographical areas. As stated, this is not the case here, for the exclusion is a use, and no classification has been made.
As previously stated, only one site could be chosen. See Van Cleve v. Passaic Valley Sewerage Com'rs, 71 N.J.L. 183, 206 (Sup. Ct. 1904), rev'd on other grounds 71 N.J.L. 574 (E. & A. 1905). My task has been to determine the rationality of the selection. Meadowlands Regional Development Agency v. State, supra, 112 N.J. Super. at 100-101 and cases cited therein.
*540 Despite the stipulations and the foregoing observations, it is contended that this constitutional question cannot be determined without further testimony and facual findings; that because of the attack upon the site of the complex, no determination can be made by summary judgment. It appears to me that the expert testimony developed in Meadowlands Regional Development Agency concerning the uniqueness of the same meadowlands will be utilized by the Appellate Division ultimately. In Meadowlands the Appellate Division, in view of the stipulations (as in the case at bar), observed (at 95-97) that on cross-motions it could dispose of the question of compliance with the constitutional section as to special or local law. But it directed the trial court to take testimony as to this question (general or special law) since it might be taking such testimony anyway. However, the trial court was directed not to make findings on that issue since it would be decided by the Appellate Division.
Therefore, the Appellate Division will make its independent findings and conclusions related to issues within its original jurisdiction, i.e., is the act special or general? To an important extent, those findings as to the uniqueness of the Hackensack Meadowlands District and the determination that the meadowlands statute is a general law must have some significant overtones regarding constitutionality of the classification in the act under consideration, as well as the 750 acres in that same meadowlands district.
If the uniqueness of the meadowlands is established, then certainly, as in Behnke v. New Jersey Highway Authority, supra (the route of Garden State Parkway designated by the Authority  not the statute), the act may likewise leave it to the discretion of the Authority to fix the situs of the paricular 750 acres therein where the complex will be located.
Although I do not believe that the factual findings in Meadowlands are necessary to a determination that the act is general, I have referred to Judge Trautwein's factual position *541 (and of course the future findings of the Appellate Division on this score) to further emphasize the unique qualities of the meadowlands. The choice of one site by the Legislature in a location which must be classified as rational is sufficient to defeat the constitutional attack of special legislation.
I find there is no genuine issue of material fact insofar as this aspect of the case is concerned. There is no merit in the argument that further fact-finding is needed before a determination can be reached on the question of general and special law. The parties have stipulated as to this most strategic location of the proposed complex. Judicial notice can be taken of other geographical and statistical facts concerning this area.
Certainly, the fact that the Legislature selected the general meadowlands location as the site which appeared suitable to it for the intended public purpose does not convert this into a special law. The test of rationality outlined in Alfred Vail Mutual Ass'n v. New Shrewsbury, supra, is met in full measure. The provisions and requirements of the act constitute a general law based on the legal criteria of such a law as enunciated in Roe v. Kervick, supra: (1) the class of subjects established is distinguished by characteristics important to make it a class by itself; (2) it encompasses all subjects which reasonably belong within the classification and does not exclude any that naturally belong.
As a matter of law I find that the act is a general law in that it fulfills the above requirements (1) and (2) and there is clearly a rational basis for the selection of the Hackensack meadowlands as the site of the complex. There is no merit in the claim of unconstitutionality.

VIII The Officers of the Authority
N.J.S.A. 18A:56-5 dedicates the tidelands to the support of public schools, and makes the State Treasurer and Attorney General trustees for all moneys received from *542 the sales of such lands. Cheval argues that the holding of ex officio positions on the Authority by said officials is incompatible with their offices as such trustees for the support of public schools. N.J.S.A. 18A:56-1. The same allegation of incompatibility is raised against William McDowell as a member of the Authority because he is a freeholder from Bergen County and a member of the Hackensack Meadowlands Commission.[1e]
One of the earliest New Jersey decisions involving incompatibility of offices is State ex rel. Clawson v. Thompson, 20 N.J.L. 689 (Sup. Ct. 1846). There, when faced with the question as to the incompatibility of the offices of Attorney General and prosecutor, the court noted that at common law
[t]he true test is, whether the two offices are incompatible in their natures, in the rights, duties, or obligations connected with or flowing out of them. Offices, says Bacon, are incompatible or inconsistent, when they cannot be executed by the same person; or when they cannot be executed with care, and ability; or where one is subordinate to, or interferes with another. [at 690]
Clawson determined, therefore, that the incumbent's holding two offices was not in itself proscribed since the prohibition takes effect only when incompatibility permeates the situation.
*543 The problem encountered in Clawson has subsequently emerged in a variety of factual situations. Yet, the philosophy of that case has prevailed. Absent the abrogation of that common law principle by the Legislature, its viability persists. Schear v. Elizabeth, 41 N.J. 321, 325 (1964); Ahto v. Weaver, 39 N.J. 418, 423 (1963); Marini v. Holster, 91 N.J. Super. 4, 8 (App. Div. 1966), aff'd 48 N.J. 289 (1966).
The approach to the problem, of necessity, has been an ad hoc one. Generally, it has been no answer to state that the conflict may arise "on but rare occasions," Kobylarz v. Mercer, 130 N.J.L. 44, 47 (E. & A. 1942), or that "the incumbent may omit to perform one of the incompatible roles." Jones v. MacDonald, 33 N.J. 132, 138 (1960).
The stringent review afforded cases of this nature, giving close heed to the particular facts and circumstances of each, is bottomed in the following concern as set forth in Jones v. McDonald, supra:
Public policy demands that an office holder discharge his duties with undivided loyalty. The doctrine of incompatibility is intended to assure performance of that quality. Its applicability does not turn upon the integrity of the person concerned or his individual capacity to achieve impartiality, for inquiries of that kind would be too subtle to be rewarding. The doctrine applies inexorably if the offices come within it, no matter how worthy the officer's purpose or extraordinary his talent. [33 N.J. at 135]
Accord, DeFeo v. Smith, 17 N.J. 183, 188 (1955).
Chief Justice Weintraub, in Reilly v. Ozzard, 33 N.J. 529 (1960), succinctly stated the modern version of the test:
Incompatibility is usually understood to mean a conflict or inconsistency in the functions of an office. It is found where in the established governmental scheme one office is subordinate to another, or subject to its supervision or control, or the duties clash, inviting the incumbent to prefer one obligation to another. [at 543]
Incompatibility is not to be confused with a conflict in interests, as Reilly made clear:
*544 In the former, a clash of duties inheres in the very relationship of one office to the other and is contemplated by the scheme of governmental activities, albeit the occasions may be rare. The consequence will be the nonperformance (or the questionable performance) of one or the other of the prescribed duties. On the other hand, a conflict of interests by virtue of a dual officeholding by a legislator will not inevitably arise as an incident of the relationship of the two offices. [at 549]
Reilly has been cited frequently in subsequent cases, and the test enunciated therein is often utilized. See e.g., Marini v. Holster, supra (statute insulated city manager who also served as city engineer and director of public works); Schear v. Elizabeth, supra (no inherent conflict of duty where city attorney is member of planning board); Ahto v. Weaver, supra (statute immunizes mayor from any possible conflict while serving as boulevard commissioner; offices of county legal assistant and mayor and township council member not incompatible).
Moving to a consideration of the specific facts and circumstances of this case, we shall first consider the charge against the Attorney General and the State Treasurer. As noted above, the Legislature may abrogate the common law rule. That is what the Legislature has done insofar as two of the ex officio positions are concerned. It has ordained that these officials can function in the dual offices, and this court must respect the wisdom of that legislative finding.
The same result must be reached in the case of William McDowell in his capacity as a member of the Hackensack Meadowlands Commission and the Authority. As Chief Justice Weintraub most judiciously noted:
Except as to offices created by the Constitution, public offices and employments are ultimately the creatures of legislation. The Legislature alone may determine the duties and the interrelation of the public posts it establishes or authorizes to be established. Within the constitutional framework, the Legislature is the architect of the structure of government. The Judiciary has no creative power in that area. The court's function is to enforce prohibitions fashioned by statute or by the common law. [Reilly v. Ozzard, supra, at 553] See N.J.S.A. 40:11-1.1, 1.2.
*545 The Legislature, of course, in directing that one member of the Authority be a member of the Hackensack Meadowlands Development Commission, had no way of knowing that the member to be chosen from the Meadowlands Commission by the Governor would be a county freeholder. In the absence of a statutory authorization, I must look to the common law as exemplified by the principles laid down in the cases heretofore reviewed.
It is Cheval's position that this fact is fatal; it will bring about a situation where one man is serving two masters. For example, Paterson Plank Road, a county road which borders the complex, will have to be widened, as will the county bridge spanning Berry's Creek. Moreover, the restructured county road will have to be served and maintained. Finally, the Authority's actions may result in tax losses as to both existing and future ratables for the county. In each of these cases it is said that McDowell will be placed in a divergent position.
It should be noted, first, that this alleged infirmity has absolutely no effect on the constitutionality of section 4(b). Generally speaking, based upon the common law rule "[t]he acceptance of the second office ipso facto vacates the first." DeFeo v. Smith, supra, 17 N.J. at 190. However, the circumstances of the particular case may bring about a situation where the officeholder is permitted to elect between the two offices. McDonough v. Roach, 35 N.J. 153, 159 (1961).
On close examination, I find nothing inherently incompatible in the two offices. Certainly neither is subordinate to the other, nor does one supervise or in any way control the other. I can discern no clash of duties. By section 8(a) the Authority "may contract with any government agency, public or private corporation which may have jurisdiction over said public highway or road to cause said public highway or road to be constructed at such location as the authority in consultation with the Meadowlands Commission shall deem most favorable." (Emphasis added.) The direction of the section is not mandatory. Moreover, *546 there can be no dispute as to payment of reconstruction and any damages that might accrue. Section 8(a) explicitly provides that the Authority must pay any costs. Therefore Mr. McDowell would not be placed in the position of having to opt for economizing on behalf of the county and spending on behalf of the Authority. In short, both offices exhibit such independence of one another that I can find no merit in the argument that they are incompatible.
As to the argument that there is the possibility of conflicts of interests, this assertion also is without weight. Reilly specifically noted that such a possibility was obviously quite distinguishable from a situation where an actual conflict was found. The former does not proscribe dual office holding, and there is no showing that the latter exists. See, e.g., Griggs v. Princeton, 33 N.J. 207 (1960).
Accordingly, I find that membership on the Authority and board of freeholders (member of Meadowlands Commission) is not inherently incompatible and that an alleged future conflict of interest, if any, is not fatal at this time.

IX Civil Service
The act does not violate N.J. Const. (1947), Art. VII, § I, par. 2. This provides in part:
Appointments and promotions in the civil service of the State, and of such political subdivisions as may be provided by law, shall be made according to merit and fitness to be ascertained as far as practicable, by examination * * *.
In essence, section 5(t) of the act states that the Authority, in selecting and maintaining its officers, agents and employees, is empowered to proceed unfettered by the foregoing constitutional provision and the statute adopted pursuant thereto. N.J.S.A. 11:1-1 et seq. That such a legislative enactment passes constitutional muster is beyond dispute, as a review of the case law and similar statutory provisions will exhibit.
*547 I am well aware of the principle that mandates a liberal construction to the end that employees be brought within the law's operation. State Department of Civil Service v. Clark, 15 N.J. 334, 341 (1954). However, this principle is of no import when the Legislature has spoken to the contrary. Proceeding on this basis, the decision by Judge (now Justice) Proctor in State v. Parking Authority, Trenton, 29 N.J. Super. 335 (App. Div. 1954), is significant. In that case the question posed to the court was whether employees of the Trenton Parking Authority came within the Civil Service Law in the manner that municipal employees did. N.J.S.A. 11:19-2. Justice Proctor answered in the negative. The Parking Authority had been established by ordinance, pursuant to N.J.S.A. 40:11A-1 et seq. Despite a close working relationship with the city, it was essentially an independent entity which sustained itself on revenues derived from fees it charged. It was in no way dependent upon moneys raised by taxation. In addition, the enabling legislation, although perhaps not specifically addressed to the question, proved to be irreconcilable with the Civil Service law. The former would permit the Authority to delegate to its employees any duties deemed proper, which power could not be carried out under Civil Service law. N.J.S.A. 11:22-12. 29 N.J. Super. at 339.
The Supreme Court recently encountered the question in a slightly different factual setting and Justice Proctor again wrote for the court. In Atlantic Community College v. Civil Service Comm'n, 59 N.J. 102 (1971), the issue posed was whether certain employees of various county community colleges were within the Civil Service Law where the particular counties had adopted such law. N.J.S.A. 18A:64A-1 et seq. Again, the statute provided no specific exemption; however, even a cursory reading of the language revealed an incompatibility between it and the Civil Service Law. 59 N.J. at 112. Additionally, the court was not persuaded that the colleges were agencies of county government, although this finding does not appear to have been *548 critical. Id. at 113. Nor was the court swayed by the fact that the colleges received partial support from the counties and student tuition in addition to that rendered by the State. In this regard, the court noted that even complete financing or control by the county would not spell a conclusive legislative intent that the Civil Service Law applies.
This decision appears to signal a relaxation of the requirements set forth in the Trenton Parking Authority case, 29 N.J. Super. 335. As stated above, the decision would have been the same whether or not the colleges were found to be independent of the counties. Moreover, financial autonomy is not a prerequisite to exemption. Whatever its bounds, I do not conceive the need of a broad sweep here. The Authority is neither the State nor a political subdivision thereof, within the meaning of N.J. Const. (1947), Art. VII, § I, par. 2. It is an independent, public body, financially self-sufficient, and by its terms not within the Civil Service Law. Section 5(t) is virtually identical to the provision construed in Atlantic Community College (N.J.S.A. 18A:64A-12(g)), as well as provisions in several other statutes. See N.J.S.A. 27:23-5(m) (New Jersey Turnpike Authority); N.J.S.A. 27:12B-5(b). See also, Jacobs v. New Jersey State Highway Authority, 54 N.J. 393, 401 (1969) (N.J.S.A. 27:12B-5(q) did not confer powers on the Authority to control retirement age of employees).
It should be added that Cheval's fear that the Legislature will utilize the Authority as a device to circumvent the state Constitution is of little moment here. The mechanism employed in section 5(t) is constitutionally permissible and will not be stricken based upon conjecture. The judgment of the court should not be substituted for that of the Legislature.
This constitutional attack must fail. There is no violation of Art. VII, § I, par. 2.

*549 X Exemptions From Local Regulation
Cheval contends that the act contravenes Art. IV, § VI, par. 2[1f] of the New Jersey Constitution of 1947 by vesting zoning power in the Authority. N.J.S.A. 5:10-5(x). This assertion belies the very language of the statute. Section 5(x) merely exempts the Authority from any land use plan, zoning regulation, building code or similar regulation in pursuing its objectives. The power vested in the Authority, "to determine the location, type and character of the project," is not co-terminus with a delegation of the zoning power. Even if the language were susceptible to Cheval's zoning argument, I would construe it to mean that nothing more than an exemption has been granted. To do otherwise would be to adopt a construction rendering the provision unconstitutional in the face of another interpretation, equally acceptable, which would uphold its validity. State v. Profaci, supra, 56 N.J. at 350.
The question of the validity of an entity's exemption from zoning ordinances is not a novel one and has been raised in varying contexts, some of which bear consideration.
In Bloomfield v. N.J. Highway Authority, 18 N.J. 237 (1955), plaintiff municipality brought suit for a declaration that defendant Authority's restaurants and gasoline stations were subject to its zoning ordinances and regulations insofar as they were located within its territorial limits. The Supreme Court, in denying the application, stated the basic principle of law applicable:
*550 There is no doubt whatever as to the power of the Legislature to immunize its public Authorities from the provisions of local zoning and building restrictions. [at 244, citing Jersey City v. Martin, 126 N.J.L. 353, 361 (E. & A. 1941)]
Although the statute creating the Highway Authority, unlike the act at hand, contained no specific exemption, the Supreme Court, seeking to ascertain the legislative intent, reasoned that no other result was possible in light of legislative history and policy considerations. Id. Indeed, it has subsequently been affirmed that "the presumption is that such immunity [is] intended in the absence of express statutory language to the contrary." Aviation Services v. Bd. of Adjustment, Hanover Tp., 20 N.J. 275, 282 (1956).
The issue was also posed in Hill v. Collingswood, 9 N.J. 369 (1952), where there arose a dispute between a municipality and a lessee of a county commission as to the applicability of the former's zoning ordinance. The enabling legislation was silent in this regard. The Supreme Court held that the ordinance's provisions did not extend to the commission.
In Aviation Services v. Bd. of Adjustment, Hanover Tp., supra, the question was presented in still a different light. Hanover Township, by an amended zoning plan, sought to prevent a lessee of the Town of Morristown, which operated that municipality's airport within Hanover's boundaries, from enlarging and reconstructing the leased premises. The enabling legislation was silent as to any exemption from local zoning regulations. There could be no presumption of immunity where the governmental entities were on an equal footing and none had a superior status. Notwithstanding, the Supreme Court ruled the ordinance inapplicable. At the core of the court's reasoning was a desire to give meaning to the legislation and not render it impotent. See Washington Tp. v. Ridgewood, 26 N.J. 578 (1958), where Chief Justice Weintraub arrived at a similar conclusion based upon the reasoning in Aviation Services.
*551 The Supreme Court's most recent disposition of the question was in Denville Tp. Comm. v. Board of Education, Morris Cty., 59 N.J. 143 (1971). In that case a zoning ordinance prevented the operation of a county vocational school in a certain district. The majority of the Supreme Court disagreed with the trial judge's ruling that the school was not subject to local zoning and held that the superior authority, the county public agency, was subject to the ordinance in question. The majority could find no evidence of a legislative intent to place the agency beyond the zoning power, and relied heavily upon an earlier decision in Roman Catholic Diocese of Newark v. Ho-Ho-Kus, 42 N.J. 556 (1964), which was considered again by the court in 47 N.J. 211 (1966). In that case, on similar facts, the court distinguished its decisions in Bloomfield, Aviation Services and Washington Tp., supra. It reasoned that in those cases the prospect of local frustration of a legislative design was a distinct possibility in the absence of immunity from the pertinent zoning ordinance. This was contrasted with the situation presented when the two bodies involved are a local governing body and a school board. In the latter case "the prospect of discord is quite remote, for the school districts, whether regional or not, share a common interest with the municipalities themselves." 42 N.J. at 560.
Justices Hall and Mountain dissented in Denville and viewed the matter as "a classic case of conflict between a municipality acting parochially and a broader range governmental entity seeking to locate a concededly needed educational facility to serve the entire county." 59 N.J. at 152. The dissenters would have reached the same conclusion as in Bloomfield, Aviation Services and Washington Tp.
No such difficulty is presented in the case at hand, for the Legislature has spoken. Section 5(x) of the act is not susceptible of double meaning. The Legislature has ordained that the Authority, as the superior governmental entity, *552 is paramount, and local zoning ordinances must yield. See Roman Catholic Diocese of Newark v. Ho-Ho-Kus, supra, 42 N.J. at 561.
I am satisfied, therefore, that there has been no violation of N.J. Const. (1947), Art IV, § VI, par. 2.

XI Delegation of Powers
Cheval complains that the Authority is given such broad latitude in the choice of projects it may construct and the activities in which it may engage as to constitute an abdication of the legislative duty embodied in N.J. Const. (1947), Art III, par. 1, commonly known as the separation of powers clause.[1g] In particular, it is urged that section 6 of the act fails to provide guidelines for the various activities enumerated thereon.[2] Since the genesis of the doctrine of separation of powers has been traced thoroughly and its meaning analyzed by Justice Proctor in David v. Vesta Co., 45 N.J. 301, 321-328 (1965), I will confine *553 my discussion to the precise issue at hand, that is, the delegation made to the Authority. However, several pertinent excerpts from David bear citation.
"[T]he doctrine of separation of powers is not peculiar to New Jersey; it exists in one form or another in almost every American constitution; and it has nowhere been construed as creating three mutually exclusive water-tight compartments. To do so would render government unworkable and the slave of a doctrine that has for its beneficial purpose the prevention of despotism that inevitably results from the concentration of all the powers of government in one person or in one organ of government." [at 324, quoting from Massett Building Co. v. Bennett, 4 N.J. 53, 57 (1950)]
The doctrine of separation of powers must therefore be viewed not as an end in itself, but as a general principle intended to be applied so as to maintain the balance between the three branches of government, preserve their respective independence and integrity, and prevent the concentration of unchecked power in the hands of any one branch. [at 326, footnote omitted]
The administrative agency is perhaps the prime illustration of the viability of this concept. Thus, it is within the context of decisions involving delegations to these agencies that the applicable principle has been formulated.
In State v. Hotel Bar Foods, Inc., 18 N.J. 115 (1955), Justice Jacobs enunciated the principle as follows:
Although the early decisions generally spoke in prohibitory terms, it is now established that legislative delegations are permissible so long as they are accompanied by sufficient basic standards. The exigencies of modern government have increasingly dictated the use of general, rather than minutely detailed standards and they have, for the most part, received the approval of our courts. [at 124, citations omitted]
State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 507, (E. & A. 1935), cited by Justice Jacobs, contains the classic and oft cited statement:
It is only necessary that the statute establish a sufficient basic standard  a definite and certain policy and rule of action for the guidance of the agency created to administer the law. [at 522]
*554 It has also been stated that a court, in ascertaining the basic standards, is obligated to look beyond "the four corners of the particular section * * * [and] examine the entire act in the light of its surroundings and objectives." Schierstead v. Brigantine, 20 N.J. 164, 169 (1955). For examples of instances where various standards have been upheld see, e.g., Burton v. Sills, 53 N.J. 86, 90-92 (1968) ("the public safety, health and welfare"); Elizabeth Federal S. & L. Ass'n v. Howell, 30 N.J. 190, 194 (1959) ("in the public interest"); In re Greenville Bus Co., 17 N.J. 131, 135 (1954) ("necessary and proper for the public convenience and properly conserves the public interests"); Ward v. Scott, 11 N.J. 117, 123-125 (1952) ("without substantial detriment to the public good"); Newark v. New Jersey Turnpike Authority, 7 N.J. 377, 383-385 (1951), app. dism. 342 U.S. 874, 72 S.Ct. 168, 96 L.Ed. 657 (1951) ("which it may determine is reasonably necessary"); State v. Seligson, 106 N.J. Super. 329, 332-333 (App. Div. 1969) ("commodities"); Department of Health State of New Jersey v. Owens-Corning Fiberglass Corp., 100 N.J. Super. 366, 383-384 (App. Div. 1968), aff'd, 53 N.J. 248 (1969) ("air pollution").
Cheval complains that the standard required by the debt limitation clause, N.J. Const. (1947), Art VIII, § II, par. 3, is more demanding and cites L. 1968, c. 128 and L. 1969, c. 13. The first statute is the "New Jersey Public Buildings Construction Bond Act of 1968," and the latter an appropriation enacted pursuant thereto. These are indeed endowed with precision and specificity. But the rigors imposed by the debt limitation clause are of no moment insofar as legislative delegation is concerned. The standards embodied in section 6, while of some breadth, are not overbroad so as to constitute an illegal delegation. Given a fertile mind one could hypothesize, as has counsel, that the section would seem to require on-site housing, schools, hospitals and varied and sundry other services for Authority employees. However, this is not the proper approach, for it suggests that *555 the Legislature intended that the Authority use its delegated power capriciously. "On the contrary, it is elementary in our State that delegated power must be exercised reasonably in its substantive aspects and that the procedural demands of due process must be honored whenever they apply." Shelton College v. State Board of Education, 48 N.J. 501, 518 (1967). The Legislature is only required to draft a statute with sufficient standards, and not to prepare a blueprint. If this were not so, the whole purpose of an authority or agency would be defeated.
In Ward v. Scott, supra, 11 N.J. at 123 the court said that the "exigencies of modern government have increasingly dictated the use of general rather than minutely detailed standards in regulatory enactments under the police power."
Counsel in Burton v. Sills, supra, likewise argued imaginatively as to the consequences of the alleged unlawful restrictions set up administratively. It was contended that the direction to the Superintendent of State Police to prescribe necessary standards and qualifications was an unlawful delegation of legislative power. Justice Jacobs observed:
We find it difficult to envision that any such consequences will result from the Law's actual operation but, in any event, are entirely satisfied that this argument of the plaintiffs, along with the others embraced within their first point, are matters of legislative rather than judicial concern. The arguments bear on the wisdom of the legislation rather than on its validity. Presumably they were all weighed by the Legislature when it concluded that the Law would further the public interest and should be adopted. We do not sit here as a superlegislature and we accept the legislative judgment as to the wisdom of the statute. See New Jersey Chapter, American Institute of Planners v. New Jersey State Board of Professional Planners, 48 N.J. 581, 609 (1967), appeal dismissed, 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967). Similarly we honor the presumption of constitutionality which attends all legislation (see Hudson County News Co. v. Sills, 41 N.J. 220, 227 (1963), appeal dismissed, 378 U.S. 583, 84 S.Ct. 1914, 12 L.Ed.2d 1036 (1964); Fried v. Kervick, 34 N.J. 68, 74 (1961)) and the doctrine that factual support for the legislative judgment will be presumed and, absent a sufficient showing to the contrary, it will be assumed that the statute rested "upon some rational basis within the knowledge and experience of the Legislature." *556 Reingold v. Harper, 6 N.J. 182, 196 (1951); United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234, 1241 (1938). [Emphasis added]
Judge Matthews, while in the Chancery Division (now sitting in the Appellate Division), expressed it well in Bayonne v. Palmer, 90 N.J. Super. 245 (1966), aff'd 47 N.J. 520 (1966):
When we consider the vast areas into which government, both federal and state, have been obliged to move because of the increasing complexities of modern society, brought about to a great extent by the increase of technical knowledge, it is readily apparent that both the Executive and Legislative Branches must resort to technicians and experts to carry out admittedly proper governmental functions. If it should be required that legislation authorizing or implementing a governmental scheme devised for the wellbeing of the people should contain details and precise rules of action for the persons entrusted with the operation of the plan, I am afraid that governmental programs requiring the use of administrators or experts would soon come to a halt  bogged down under a morass of legislation and requests for interpretation of the regulations embodied therein. If the Legislature is required to lay out detailed rules, it would be bound to thwart its own purpose. Legislators cannot be held to perfect anticipation in complex and changing circumstances. Broad principles often have to suffice. Sayreville v. Pennsylvania R.R. Co., 26 N.J. 197 (1958) [90 N.J. Super. at 287]
In light of the foregoing principles, I find no illegal delegation of legislative power that would contravene the separation of powers clause of our Constitution.

XII Eminent Domain
The Legislature, pursuant to N.J. Const. (1947), Art. IV, § VI, par. 3, has provided the Authority with the power of eminent domain. N.J.S.A. 5:10-5(m), 8, 9. Section 9 declares that compensation shall be ascertained and paid in accordance with N.J.S.A. 20:1-1 et seq., and goes on to provide a detailed scheme for purposes of condemnation procedure. It is stipulated, arguendo, that the projected site for the complex is the area adjacent to and bounded by Route 3, Berry's Creek, Paterson Plank Road and the New Jersey *557 Turnpike's western spur. Cheval contends that this constitutes a taking without just compensation. There is no merit in this contention.
Our Supreme Court has held that the sovereign possesses the power of eminent domain whether or not it is set forth in a constitution. State by State Highway Com'r v. Burnett, 24 N.J. 280, 287 (1957). The only limitation on the exercise of the power is that just compensation be awarded. Id.; U.S. Const. Amend. V; N.J. Const. (1947), Art. I, par. 20. Before reaching this issue, however, the threshold question must, of necessity, be whether there has been a taking. Indeed, this can be a vexing and thorny problem when encountered in the context of a regulation upon land use. See Spiegle v. Beach Haven, 46 N.J. 479, 490-491 (1966). Nevertheless, under the facts in this case, and in view of a recent decision by our Supreme Court, there is no difficulty in concluding that there has been no taking by the Authority.
In Wilson v. Long Branch, 27 N.J. 360, 373-375 (1958), cert. den. 358 U.S. 873, 79 S.Ct. 113, 3 L.Ed.2d 104 (1958), the court was faced with the novel question as to whether the Blighted Area Act, N.J.S.A. 40:55-21.1 et seq., constituted a taking of property without just compensation prior to actual condemnation. Section 21.10 of that act did not require the municipality to proceed against the property notwithstanding a declaration that the area was blighted. Plaintiff argued the declaration was tantamount to a taking, since the marketability of the property was severely impaired, if not totally destroyed. The Supreme Court unanimously held that this was at most damnum absque injuria, incident to the exercise of the police power, and not a taking in the constitutional sense.
Apparently Wilson's holding was misconceived in the sense that it was believed by some that the diminution in value brought about by the declaration of blight was not compensable. Hence, in Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374 (1971), the court was called upon to *558 dispel this misconception. It is now firmly established that a declaration or announcement of the type in Wilson, while not a taking, may well be significant in the awarding of just compensation. See N.J.S.A. 40:55-21.10 and N.J.S.A. 20:1-9.
Based upon Wilson and Jersey City Redevelopment, I cannot discern any taking without just compensation in the case at hand. The Authority has done nothing beyond a stipulation, arguendo, that the proposed site will be within a specified area. There is no interference with the enjoyment or use of any parcel of property therein by virtue of the act. See Jersey City Redevelopment, supra, at 378, and cases cited therein. It is as if a map were filed indicating the actual situs; such an action is not a taking. See Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897), cited in Wilson, supra, 27 N.J. at 375. The taking in this case will occur upon the filing of a complaint. If immediate physical possession is sought at that time, it follows that a declaration of taking and a deposit of estimated compensation will be necessary. N.J.S.A. 5:10-9. None of this has come to pass.
There has been no taking without just compensation which is violative of any provision of the New Jersey or United States Constitution.

XIII The Taxation Exemption
Cheval and East Rutherford contend that sections 7(h)[1h] and 18[2a] of the Act are in contravention of the taxation provisions *559 of the New Jersey Constitution of 1947, specifically Art. VIII, § I, pars. 1 and 2. Paragraph 1 provides, in part: "Property shall be assessed for taxation under general laws and by uniform rules." Paragraph 2 provides, in part: "Exemption from taxation may be granted only by general laws."
Section 7(h) exempts the proposed race track from payment of any admission or amusement tax, excise tax, license or horse racing fee, no matter who the assessor or collector may be.
Section 18(a) of the act states that the projects and other property of the Authority serve a public purpose and are exempt from all taxes and special assessments, with one exception not pertinent for our purposes. Since I have held the statute to be a general law, the constitutional requirements are satisfied. It is undisputed that exemptions granted to non-governmental owners are strictly construed in contrast to those in favor of governmental agencies. Walter Reade, Inc. v. Dennis Tp., supra, 36 N.J. at 440. Section 26 of the act plainly states that the act is to be construed liberally in furtherance of the legislative intent. This intent, for purposes of section 18, seeks to insure the financial success of a self-supporting governmental entity by means of a tax exemption. The exemption provision is similar to that enjoyed by other public authorities. N.J.S.A. 27:12B-16 (State Highway Authority) and N.J.S.A. 27:23-12 (Turnpike Authority).
Section 18(b)[3] provides the formula to be utilized for payment-in-lieu *560 of taxes to the particular municipality, East Rutherford, where the project is to be situated. The Authority has stipulated for purposes of argument that East Rutherford will incur a substantial loss of tax ratables and experience an increased demand for municipal services as a result of the development of the sports complex. In this regard, it is submitted that sections 18(a) and (b) unconstitutionally delegate the legislative power to tax.
At the outset it should be emphasized that the increased cost of services incurred by East Rutherford as a result of the project are entirely proper. As stated in Becker v. Adams, 37 N.J. 337, 340: "Municipal corporations are merely political subdivisions of the State and the legislative control over them is almost unlimited." Accordingly, it has long been held that the fact "that the legislature (sic) may, of its own will, impose a duty upon the municipal authorities in this respect which they cannot decline, is undoubted." Easton and Amboy R.R. Co. v. Central R.R. Co., 52 N.J.L. 267, 275 (Sup. Ct. 1890).
In Meadowlands Regional Development Agency v State, supra, 112 N.J. Super at 110, the two conditions which limit the sovereign's power to impose such expenses were set forth as (1) the expense must be for a public purpose, and (2) the statute which imposes it must be general and not special, private or local. Since I have already determined that these elements are clearly present in the act under consideration, the foregoing conditions are met in full measure.
*561 N.J. Const. (1947), Art. IV, § I, par. 1, provides: "The legislative power shall be vested in a Senate and General Assembly." This provision is in no way transgressed here, for the Legislature has not improperly delegated its taxing power. There is no dispute with the principles of law stated by Cheval; it is in their application that the error arises.
In Bernards Tp. v. Allen, 61 N.J.L. 228, 238 (E. & A. 1897), the court noted that once the Legislature has prescribed a rule of taxation, it "may intrust the assessment and collection of taxes in conformity with prescribed rules to officers appointed by other authority." In Van Cleve v. Passaic Valley Sewerage Com'rs, 71 N.J.L. 574, 582-583 (E. & A. 1905), the court struck a statutory scheme on the ground that by granting discretion to determine the amount of taxation, it illegally delegated the taxing power to a nongovernmental body. Unlike Van Cleve, there is no unbridled discretion vested in the Authority to determine the amount to be raised by taxation. The Authority is merely empowered to fit the correct figures into the formula the Legislature has provided. It is purely "a matter of mechanics," and no legislative power is delegated. See Switz v. Kingsley, 37 N.J. 566, 581 (1962). Nor is the result different when section 18 of the act is read with N.J.S.A. 13:17-67(c) of the Hackensack Meadowland Reclamation and Development Act. Section 67(c) thereof is part of an extensive statutory scheme involving the intermunicipal tax sharing pool which is found in N.J.S.A. 13:17-60 et seq. Standing alone, the latter sections withstood constitutional challenge in Meadowlands Regional Development Agency v. State, supra, 112 N.J. Super. 89 (Ch. Div. 1970). There Judge Trautwein found no basis for the assertion that the participating municipalities, in effect, would be stripped of their taxing power. I do not conceive in what manner section 18, when juxtaposed to N.J.S.A. 13:17-67(c), brings about that result here.
What the challengers are attempting to do is bring the instant case within the Van Cleve holding that "the Legislature can delegate the taxing power only to political districts of *562 the state, to be exercised within their respective limits; and * * * that some power of local self-government is essential to every political district." 71 N.J.L. at 583. I have searched in vain for language which authorizes the Authority to levy taxes; see Passaic v. Consolidated Police, etc., Pension Fund Comm'n, 18 N.J. 137 (1955); Switz v. Kingsley, supra. I therefore find no merit in this assertion.

XIV One Man - One Vote
The further argument that the act violates the "one man - one vote" doctrine by failing to provide for elections of the Authority's members is without substance. Neither decision cited in support of this contention is apposite. In State (Lydecker) Pros. v. Drainage & Water Com'rs of Englewood, 41 N.J.L. 154 (Sup. Ct. 1879), the court struck a statute on the ground that it authorized the levy of a tax in an area which was not a political district. In Kirkpatrick v. Preisler, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), the United States Supreme Court upheld a challenge to the Missouri congressional redistricting statute which permitted certain variances among the particular districts.
The "one man - one vote" principle has been directed primarily to legislative bodies. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). It has not been extended to "state or local officers of the nonlegislative character" who are appointed rather than elected. Sailors v. Kent Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). However, legislative power is not the sole test, as can be seen from the Supreme Court's ruling in Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). There the court ruled invalid the method of selecting a county commissioners court despite the fact that the court was not purely a legislative body. The rationale of the court's ruling was that the body was an entity with general governmental powers over the *563 county. In the course of its opinion the court, speaking through Mr. Justice White, reiterated the perimeters of the doctrine. Although addressed to the Equal Protection Clause, the language is appropriate here:
* * * [T]he Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local government. We will not bar what [has been] called "the emergence of a new ideology and structure of public bodies, equipped with new capacities and motivations * * *" [390 U.S. at 485, 88 S.Ct. at 1120-1121]
The Authority is not a legislative body, although it performs some legislative functions, nor is it an entity with general governmental powers in the sense of Avery. It is a part of a department established in the executive branch of the State Government. See N.J.S.A. 5:10-4 and N.J.S.A. 52:27D-1 et seq. (establishing the Department of Community Affairs) Moreover, there is no election involved here which would call into play the principle of "one man-one vote." See Hadley v. Junior College Dist. of Metro Kansas City, Mo., 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970). Furthermore, there is no committee comprised of members from constituent municipalities of the type envisioned in N.J.S.A. 13:17-7 and 8. Meadowlands Regional Development Agency v. State, supra, 112 N.J. at 131-132. In sum, we are concerned merely with members of an Authority who are appointed officials. The Fourteenth Amendment of the United States Constitution is in no way transgressed.

XV Impairment of Contracts
It is urged that the act violates Art. IV, § VII, par. 3 of the New Jersey Constitution of 1947 and Art. I, § 10 of the United States Constitution, both of which pertain to the prohibition against impairment of the obligations of contracts. It is well established that the interdiction is not an absolute one. City of El Paso v. Simmons, 379 U.S. *564 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). Generally, it will not prevent the state from pursuing its police powers albeit contracts previously entered into may be affected. Bucsi v. Longworth B. & L. Ass'n, 119 N.J.L. 120, 123 (E. & A. 1937); Ohlson v. Phillips, 304 F. Supp. 1152 (D.C. Colo. 1969), aff'd 397 U.S. 317, 90 S.Ct. 1124, 25 L.Ed.2d 337 (1970); Farrell v. Drew, 19 N.Y.2d 486, 281 N.Y.S.2d 1, 227 N.E.2d 824 (Ct. App. 1967). Cf. New Jersey Highway Authority v. Sills, 111 N.J. Super. 313 (Ch. Div. 1970). Put another way, it is an implied condition of each and every contract that "its fulfillment may be frustrated by a proper exercise of the police power." Veix v. Seneca Building & Loan Ass'n, 126 N.J.L. 314, 320 (E. & A. 1941). Thus, so long as the exercise of the police power is proper or reasonable, no contractual right is impaired. Lakewood Express Serv. v. Board of Public Utility Com'rs, 1 N.J. 45, 50 (1948).
I have ruled that the act is a reasonable exercise of the police power in that it is general law with a public purpose and will greatly enhance the general welfare of the citizens of New Jersey. There is no violation of the foregoing constitutional provisions.

XVI Severability
Section 25 of the act[1i] pertains to the doctrine of severability. It clearly provides that the invalidity of any clause, sentence, paragraph, section or part of the act shall not affect the remainder thereof. Mainly, we have been concerned with the arguments addressed to the constitutionality *565 of the statute as a whole rather than with the individual attacks on subordinate provisions. Burton v. Sills, 53 N.J. 86, 92 (1968).
The law-making body did not design the act to stand or fall as a unitary whole. The legislative intention is clear that the act is severable in the event of partial invalidity.
If the principle object of the act is constitutional, certainly any subordinate provisions can be excised without substantial impairment of the general purpose. Angermeier v. Sea Girt, 27 N.J. 298 (1958).

XVII Conclusion
A court should have creative power in areas of public interest or concern. Attuning the law to the times is one of the principal functions of justice and the courts. Concepts must change if the Constitution is to be that "living organism and not a straitjacket."
Chief Justice Weintraub wrote a most enlightening article as to legislative thinking by the judiciary which was entitled "Judicial Legislation", 81 N.J.L.J. 545 (1958). Several excerpts follow:
I would like to discuss with you a process approbiously called "judicial legislation." I could use a more palatable term, but I prefer "judicial legislation" because I believe it accurately describes an important phase of the process of decision by the state courts and because I believe there can be more profit in frank acknowledgment than in resort to some fictional veneer, such as "judicial declaration of the law."

* * * * * * * *
Granted, what I believe all will concede, that the law must remain current, must reflect changing mores and values, must be adequate to resolve new problems with minimum disappointment to fair-minded men, the question remains whether the task is properly the sole responsibility of the legislative branch of government. I say "properly" of the legislative branch because I have no doubt the state judiciary labors in that vineyard and hence to me the question is whether there is a trespass.

*566 * * * * * * * *
We may as well concede that the judiciary makes law and changes judge-made law and deny a trespass on the basis that the constitutional framers could not have intended what would otherwise be a sterile and futile system of law.
To some degree, this thinking has been utilized to determine that the sports complex authorized by the New Jersey Sports and Exposition Authority Law is legally sound. It will be located in the heart of the regional population belt and easily accessible by major transportation arteries. With a megalopolis population of 17 million people in the New Jersey, New York (five boroughs, Long Island, Rockland and Westchester Counties), and Connecticut market areas, New Jersey's economy must be stimulated.
Despite an arsenal of alternatives for the use of the 21,000 acres of meadowlands, a court exercising that creative power should concern itself with the improvement of the sociological environment as well as the physical environment. And that is why it would be so conceptual to allocate a relatively small part of that acreage for a low-density, transitory use. The exciting designation of this area for a sports complex would be superior to industry, high-rise structures and wall-to-wall development. The meadowlands is the perfect site. It will be an excellent economic and prestigious achievement for New Jersey.
All in all, and argument for argument, on balance, the substantial and forceful multi-pronged attack has not established any legal infirmity in the act or the deprivation of any basic right. Accordingly, the judgment of this court declares the New Jersey Sports and Exposition Authority Law to be constitutional.
NOTES
[1] "Distribution of sums deposited in parimutuel pools to winners thereof and payments from the remaining balances in such pools for stakes, purses or rewards and special trust accounts for breeding and development of horses shall be for the purposes of and in accordance with the provisions of P.L. 1940, c. 17 (C. 5:5-22 et seq.) pertaining thereto. In addition, as an initial payment to the State, an amount equal of 1/2 of 1% of all parimutuel pools shall be deposited annually in the General State Fund. All amounts remaining in parimutuel pools after such distribution and payments shall constitute revenues of the authority. Except as otherwise expressly provided in this section 7, the authority shall not be required to make any payments to the Racing Commission or others in connection with contributions to parimutuel pools."
[1a] This provision is not similar to that struck by Chief Justice Vanderbilt in New Jersey Turnpike Authority v. Parsons, 3 N.J. 235, 246 (1949). There section 17 of the Turnpike Act authorized the State Highway Authority in its unfettered discretion to expend its funds and utilize its engineering and other capabilities for the purpose of the study of the Turnpike project. Part of the obligation or expense incurred would not be repaid. The Chief Justice found the delegation to the State Highway Commissioner an abdication of the Legislature's power over the purse. A provision similar to that in the case at hand was apparently unchallenged in Clayton v. Kervick, 52 N.J. 138 (1968).
[1b] "The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years."
[1c] Schultz v. Wilson, 44 N.J. Super. 591 (App. Div. 1957), holds that the State has title to the land under tidewater notwithstanding the lack of navigability.
[1d] Mrs. Edgar Eisler, New Jersey Citizens for Clean Air; Mr. David Moore, North Jersey Conservation Foundation; Mrs. Betty Little, Coordinator for Citizens for Conservation; Commissioner Richard J. Sullivan, Department of Environmental Protection; Mr. Alan J. Miller, National Audubon Society; Mrs. Ella Filippone, Environmental Research Associates, Inc.
[1e] N.J.S.A. 5:10-4(b) states:

"The authority shall consist of the State Treasurer, the Attorney General and a member of the Hackensack Meadowlands Development Commission to be appointed by the Governor, who shall be members ex officio, and four members appointed by the Governor with the advice and consent of the Senate for terms of 4 years, provided that the members of the authority (other than the ex officio members) first appointed by the Governor shall serve for terms of 1 year, 2 years, 3 years and 4 years, respectively. Each member shall hold office for the term of his appointment and until his successor shall have been appointed and qualified. A member shall be eligible for reappointment. Any vacancy in the membership occurring other than by expiration of term shall be filled in the same manner as the original appointment but for the unexpired term only."
[1f] "The Legislature may enact general laws under which municipalities, other than counties, may adopt zoning ordinances limiting and restricting to specified districts and regulating therein, buildings and structures according to their construction, and the nature and extent of their use, and the nature and extent of the uses of land, and the exercise of such authority shall be deemed to be within the police power of the State. Such laws shall be subject to repeal or alteration by the Legislature."
[1g] "The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in the Constitution."
[2] 6.a. The authority, pursuant to the provisions of the act, is hereby authorized and empowered to establish, develop, construct, operate, maintain, improve and otherwise effectuate a project to be located in the Hackensack meadowlands upon a site not to exceed 750 acres consisting of one or more stadiums, coliseums, arenas, pavilions, stands, field houses, playing fields, recreation centers, courts, gymnasiums, club houses, a race track for the holding of horse race meetings, and other buildings, structures, facilities, properties and appurtenances incidental and necessary to a complex suitable for the holding of athletic contests or other sporting events, or trade shows, exhibitions, spectacles, public meetings or other expositions, and such project may include driveways, roads, approaches, parking areas, parks, recreation areas, food vending facilities, restaurants, transportation structures, systems and facilities, and equipment, furnishings, and all other structures and appurtenant facilities related to, necessary for, or complementary to the purposes of the project or any facility thereof."
[1h] "7.h. No admission or amusement tax, excise tax, license or horse racing fee of any kind shall be assessed or collected from the authority by the State of New Jersey, or by any county or municipality, or by any other body having power to assess or collect license fees or taxes."
[2a] "18.a. All projects and other property of the authority is hereby declared to be public property devoted to an essential public and governmental function and purpose and shall be exempt from all taxes and special assessments of the State or any political subdivision thereof; provided, however, that when any part of the project site not occupied or to be occupied by facilities of the project is leased by the authority to another whose property is not exempt and the leasing of which does not make the real estate taxable, the estate created by the lease and the appurtenances thereto shall be listed as the property of the lessee thereof, or his assignee, and be assessed and taxed as real estate."
[3] "18.b. To the end that there does not occur an undue loss of future tax revenues by reason of the acquisition of real property by the authority for the meadowlands complex, the authority annually shall make payments in-lieu-of-taxes to the municipality in which such property is located in an amount computed in each year with respect to each such municipality by multiplying the total amount to be raised by real property taxation in each such year by a fraction, the numerator of which is the amount of real property taxes assessed against the property acquired by the authority in the tax year in which this act becomes effective and the denominator of which is the total amount to be raised by real property taxation in such municipality in the tax year in which this act becomes effective. Such payments shall be made in each year commencing with the first year subsequent to the year in which such real property shall have been converted from a taxable to an exempt status by reason of acquisition thereof by the authority."
[1i] "If any clause, sentence, paragraphs, section or part of the act shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section or part thereof directly involved in the controversy in which such judgment shall have been rendered."